WALD, Circuit Judge:
 

 This criminal contempt conviction arose out of a civil class-action suit in which District of Columbia Department of Corrections (“DOC”) employees alleged that they had been victims of sexual harassment and retaliation. Appellant Sylvia Young was convicted of criminal contempt for violating a court order issued in conjunction with the sexual harassment lawsuit that enjoined DOC, together with all its agents and employees, from taking or threatening any retaliatory action against witnesses testifying in the lawsuit. Young was sentenced to 180 days in prison. On appeal, she claims that her conviction should be reversed for two reasons: (1) there was insufficient evidence to convict her because the court order from which the contempt charge arose was not sufficiently clear and specific; and (2) the district court violated her rights under the Due Process
 
 *-679
 
 Clause and Federal Rule of Criminal Procedure 42(b) by failing to provide her with adequate notice of the charges against her in its show cause order. We find that neither of these two claims has merit and affirm the conviction. Young did not challenge her sentence, and therefore its appropriateness is not at issue in this appeal,
 

 I.Background
 

 At the time of the events that gave rise to this criminal contempt conviction, appellant Sylvia Young had been employed as a DOC corrections officer for approximately seven years. During her tenure, a number of other DOC employees brought a class action alleging sexual harassment and retaliation.
 
 See Bessye Neal v. Margaret Moore, Acting Director, D.C. Dep’t of Corrections,
 
 No. 93cv2420 (RCL).
 
 [1]
 
 On March 15, 1995, the district court judge presiding over the
 
 Bessye Neal
 
 case issued a preliminary injunction stating that
 

 2. Defendants, together with all of their agents
 
 and employees,
 
 are enjoined from taking any retaliatory action, or making any threats of retaliatory action, against any person who has been or may be called to testify as a witness in this case, and who is listed on Exhibit A, attached hereto.
 

 Appendix (“App.”) A1 (emphasis added). The district court directed DOC to distribute copies of the order to all Department employees, to post the order at Department facilities, and to ensure that the order was read at roll calls. Accordingly, DOC circulated the court order to all its employees, along with a supplementary memorandum explaining the order’s meaning and import.
 
 [2]
 
 On March 17, 1995, Young (along with all other DOC employees) individually signed a document certifying that she had received and read the March 15 order and that she understood she was bound by it.
 

 Like appellant, Yvonne Brown was employed as a corrections officer at DOC. In early 1995, both Brown and appellant were assigned to DOC’s Transportation Unit in Lorton, Virginia. Brown was a dispatcher, and was chiefly responsible for assigning other officers to transport inmates to court or to other appointments. Correctional officers assigned to the Transportation Unit receive and return their equipment at the dispatch office at the beginning and end of each shift. Brown was one' of the witnesses in the
 
 Bes-sye Neal
 
 case and was therefore listed on Exhibit A to the court’s March 15 order. On March 3, 1995, Brown testified that Lieutenant Laviska Gerald, a friend of Young’s and a supervisor in the unit in which Brown worked, had sexually harassed Brown.
 

 Brown and Young worked different shifts, but their times in the office often overlapped. Prior to March 6, 1995, Brown and Young had a “cordial” working relationship. However, on March 6, following Brown’s testimony against Gerald and a subsequent article in the
 
 Washington Post
 
 detailing that testimony,
 
 [3]
 
 . the relationship between Young and Brown changed dramatically for the worse. Young began to threaten and verbally harass Brown. On March 6, appellant came to the dispatch office door where Brown was working and said, “I have to be careful about what I say because motherfuckers will have you in court telling shit like they did [about] Gerald.” App. B26. On March 9, appellant approached the dispatch door where Brown
 
 *-678
 
 was working and said, “I’m not going to talk in here because this telling bitch that got-Gerald in trouble is in here.” App. B27. On March 14, appellant walked up to the dispatch office door and told Brown, “Don’t let me catch you smoking in here because I’m telling because I want to get paid.” App. B73-74. When Brown responded by commenting about Young’s regular paycheck, appellant retorted, “That’s not what I’m talking about. I’m talking about getting paid like you and Wyatt [another witness in the
 
 Bes-sy e Neal
 
 litigation].”
 

 On March 15, the district court issued its injunction forbidding any and all DOC employees or agents from engaging in retaliatory conduct based on the pending sexual harassment suit. Even subsequent to that date, however, Young’s harassing comments and actions continued. On March 22, appellant approached the dispatch office door to turn in her equipment to Brown and said, “Get off your ass and take this equipment before I slap you.” App. B31. On April 21, appellant walked up to the dispatch office door and told Brown, ‘You better get the hell out of here with that cigarette.” Brown countered that appellant was “off duty and you have been off and you don’t have anything to do with what I am doing.” Appellant then used profane language to Brown and, after making a telephone call at the office door, told Brown, “If you have something to say, say it now so I can slap you.” App. B29-30.
 

 On May 8, appellant was showing photos to another correctional employee, Corporal Joseph Hill, at the door to the dispatch office. When Hill suggested that Brown view the pictures, Brown declined and appellant said, “No, that bitch is not looking at my pictures.” In an ensuing argument between Brown and Young, appellant said she would “kick [Brown’s] ass” and “blow [her] away.” App. B32. The shift supervisor, Lieutenant Rita Goodall, broke up the argument. As Young was being led outside by Sergeant Curtis, Young stated to Goodall, “Brown acts like she can’t be touched but I don’t care about that suit.” App. C56-57.
 

 On May 16, appellant again harassed Brown by dropping rounds of live ammunition on the floor in front of Brown when returning her equipment, laughing, and stating to Brown “that is your problem.” App. B33, C4r-5. Such conduct with weapons or ammunition violated Department of Corrections safety policy. Finally, on July 21, appellant attempted to trip Brown as she was entering one of the trailers that made up the Transportation Unit. App. C16.
 

 In addition to these actions directed against Brown, Young also publicly expressed her unhappiness with Brown’s trial testimony. About two weeks after Brown’s testimony, Young told her friend and coworker Larry Wellington that “they didn’t have to do what they did to Gerald.” App. C23. And in April 1995, Young told Theresa Manigault, a training officer, that “somebody needs to talk to Brown because that’s messed up what she’s doing to Gerald.” App. C33.
 

 Moreover, during the course of the events leading to the contempt conviction, Young was twice taken aside by other correctional employees who suggested that her conduct was improper in light of the district court’s order. First, in April 1995, when Young expressed her displeasure at Brown’s testimony in the case, Manigault told her “you need to leave that alone. You have no control over that. That’s none of your business.” App. C33. And again later, after the May 8 altercation; Corporal Hill reminded Brown about the district court’s order, stating “you know that the judge’s order said, any type of retaliation against those people on the list.” He warned her that “you need to stop messing with Brown before you get in trouble.” App. B75. Despite these warnings from co-workers, Young’s harassment of Brown continued.
 

 Following these events, Brown moved the court to hold Young in contempt of the order, alleging that Young had violated the judge’s order by retaliating against Brown because of Brown’s testimony in the
 
 Bessye Neal
 
 case. The Office of Personnel Management (“OPM”) investigated Brown’s allegations and concluded that appellant had retaliated against Brown for her testimony. A Special Master appointed by
 
 the
 
 district court reviewed the report of OPM’s investigation and agreed with the report, finding that there
 
 *-677
 
 was “ample evidence that Young did subject Brown to a series of abusive and threatening statements and associated behavior beginning after Brown’s testimony in March 1995,” and that there was “probable cause to believe that [appellant’s] remarks and behavior were, the result of retaliatory animus stemming from Brown’s trial testimony.” App. A16. The district court adopted the Special Master’s recommendation and issued an order directing Young to show cause why she should not be held in contempt for violating its March 15 order. After a two-day bench trial,
 
 [4]
 
 the district court entered a guilty verdict and sentenced Young to 180 days in prison.
 

 II. Analysis
 

 A.
 
 Sufficiency of the Evidence
 

 To convict an individual of criminal contempt under 18 U.S.C. § 401(3),
 
 [5]
 
 the government must prove beyond a reasonable doubt the existence of a court order that is “clear and reasonably specific.”
 
 United States v. NYNEX Corp., 8
 
 F.3d 52, 54 (D.C.Cir.1993). The government must also prove that the defendant violated the order, arid that the violation was willful.
 
 Id.
 
 Appellant argues that the government failed to prove beyond a reasonable doubt that the judge’s order was “clear and unequivocal at the time it [was] issued.”
 
 In re Holloway,
 
 995 F.2d 1080, 1082 (D.C.Cir.1993). She argues that the March 15 order was too vague to give a correctional officer with little more than a high school education
 
 [6]
 
 fair notice of what conduct was prohibited. She claims that the order was ambiguous in two particulars: (1) the order appeared to apply only to supervisory employees; and (2) because the words “retaliatory action” were not specifically defined or explained, it was not clear on its face that the order prohibited the kind of conduct in which appellant engaged.
 

 This court reviews the sufficiency of the evidence
 
 de novo,
 
 viewing the facts in the light most favorable to the government.
 
 United States v. Johnson,
 
 952 F.2d 1407, 1409 (D.C.Cir.1992). We apply “the familiar standard for any criminal conviction,” that is, “asking whether a fair-minded and reasonable trier of fact [could] accept the evidence as probative of a defendant’s guilt beyond a reasonable' doubt.”
 
 In re Ellenbogen,
 
 72 F.3d 153, 157 (D.C.Cir.1995) (quoting
 
 In re Holloway,
 
 995 F.2d 1080, 1082 (D.C.Cir. 1993)) (internal quotation marks omitted). Employing this standard of review here, we conclude that the evidence was sufficient to support the criminal contempt conviction of Young. Contrary to appellant’s contentions, all three requirements of a criminal contempt conviction were satisfied: (1) the court order was clear and reasonably specific; (2) appellant violated the order; and (3) her violation of the order was willful.
 

 1.
 
 The March 15 Order Was Clear and Reasonably Specific
 

 First, despite appellant’s claims to the contrary, the record shows that she had sufficient notice of the illegality of her conduct in retaliating against Brown for her testimony in the
 
 Bessye Neal
 
 case. In determining whether an order is sufficiently clear and specific to justify a contempt conviction, we apply an objective standard that takes into account both the language of the order and the objective circumstances surrounding the issuance of the order: “ “Whether an order is
 
 *-676
 
 clear enough depends on the context in which it is issued and the audience to which it is addressed.’”
 
 In re Levine,
 
 27 F.3d 594, 596 (D.C.Cir.1994) (quoting
 
 In re Holloway,
 
 995 F.2d 1080, 1082 (D.C.Cir.1993)).
 

 The record shows that this order was sufficiently clear. For one thing, appellant’s contention that she believed the order applied only to supervisors and not to a nonsupervisory employee like herself is implausible. The March 15 order-was directed to
 
 all
 
 employees of the Department of Corrections. The order enjoined the Department of Corrections, “together with all of [its] agents and employees, ... from taking any retaliatory action, or making any threats of retaliatory action” against any protected witness. App. Al. Appellant, like all other employees, was required to sign a form (and' did so on March 17, 1995) indicating that she had .“personally received and read” the March 15 order “which prohibits] retaliation against all witnesses who may be called to testify in the sexual harassment lawsuit,” and that shé “understood] that [she was] bound by the Court’s March 15, 1995' Order and previous orders of the Court ..., and that any violation of these orders may subject [her] to sanctions for criminal contempt including fines and/or imprisonment.” App. All. Additionally, the context in which the order was issued to DOC employees further demonstrates its intended coverage of nonsupervisors; indeed, the record shows that other employees understood that the order so applied to nonsupervisory employees. Aside from the fact that each employee had to sign a form expressing his or her understanding of the order, DOC distributed a supplementary memorandum (addressed to “ALL EMPLOYEES”) explaining that
 
 “[ajnyone
 
 who violatefd] the order” was subject to discipline, and two different co-workers specifically told appellant she should leave Brown alone because of the court’s order.
 
 [7]
 

 Similarly implausible is appellant’s claim that she did not understand that her hostile words and behavior toward Brown constituted “retaliatory action” within the meaning of the order. Officer Larry Wellington, a friend of Young’s, testified at the bench trial that he, Young, and other employees “didn’t have an understanding of what retaliation was,” and that “the order was never explained to us in detail on what it meant.” The district court rejected these assertions, “find[ing] that any common sense understanding would lead any person to know that you cannot treat a person differently because of their testimony here in court.”
 
 [8]
 
 Wherever the outside parameters of contempt for treating a person “differently” might be, we agree with the district court that on the facts of this cáse, a high school educated individual should have had a “common sense understanding” that acts of the sort committed by Young against Brown were “retaliatory” in
 
 *-675
 
 nature and therefore forbidden by the March 15 order.
 
 [9]
 
 Indeed, as the government persuasively argued, the key terms in the order (“all ... agents and employees” and “any retaliatory action”) “are not complex legal terms but rather are readily understandable to a high school graduate, such as appellant, who has also taken college level courses.” Brief for the United States, at 17. In sum, the aggregate acts at issue here — overt threats and insults, use of profanity, and hostile actions such as throwing live ammunition near Brown, conduct all of which commenced
 
 after,
 
 and inferentially as “pay back” for,
 
 [10]
 
 Brown’s testimony against Gerald— clearly constituted “retaliatory action” within any common-sense definition of that term.
 

 2.
 
 Appellant Violated the March 15 Order
 

 Second, the record overwhelmingly supports the district court’s finding that appellant violated the order. Appellant and Brown had a normal working relationship prior to March 1995. Immediately after learning of Brown’s March 3 testimony against Gerald, appellant initiated a sequence of hostile actions toward Brown. The first verbal assault took place on March 6, 1995, two days after the
 
 Washington Post
 
 article detailing Brown’s testimony, and continued with further hostile comments directed at Brown on March 6, March 9, and March 14.
 
 [11]
 
 Furthermore, following the issuance of the March 15 order (and in defiance of it), Young maintained the pace of her harassing comments and actions. On March 22, appellant came to the dispatch office door to turn in her equipment to Brown and said, “Get off your ass and take this equipment before I slap you.” App. B31. On April 21, appellant made other comments and used profane language in speaking to Brown. App. B29-30. On May 8, appellant declined to show her photos to Brown and stated (in the presence of another correctional employee), “No, that bitch is not looking at my pictures.” During the same incident, appellant said she would “kick [Brown’s] ass” and “blow [her] away.” App. B32. After the shift supervisor broke up the argument, Young stated, “Brown acts like she can’t be touched but I don’t care about that suit.” App. C56-57. And in the May 16 incident, appellant dropped live ammunition on the floor in front of Brown when returning her equipment and stated “that is your problem,” App. B33, C4-5, conduct clearly violative of DOC safety policy. These acts
 
 in toto
 
 indisputably constituted “retaliatory action” against a protected witness within the meaning of the district court’s order.
 

 3.
 
 Appellant’s Violation of the March 15 Order Was Willful
 

 Third, appellant’s violation of the order was proven beyond a reasonable doubt to be willful. To establish willfulness, the government must show beyond a reasonable doubt that appellant acted with deliberate or reckless disregard of her obligation under the March 15 order.
 
 In re Holloway,
 
 995 F.2d at 1082. There was abundant evidence of such willfulness in this case. Brown repeatedly showed her defiance to the order, both by her numerous comments and actions directed against Brown (detailed above) and by her comments to co-workers about the order. On May 8, appellant stated that she did not care about the lawsuit and threatened to “blow [Brown] away.” Moreover, Young ignored two separate warnings from co-workers that indicated she might be violating the court ■ order. First, in April 1995, when Young expressed her displeasure at Brown’s testimony in the case, co-worker Manigault told her “you need to leave that alone. You have no control over that. That’s none of
 
 *-674
 
 your business.” App. C33. Second, after the May 8 altercation, Corporal Hill reminded Young about the district court’s order, stating “you know that the judge’s order said, any type of retaliation against those people on the list.” He warned her that “you need to stop messing with Brown before you get in trouble.” App. B75. Despite these warnings, Young’s harassment of Brown continued. Taken in the light most favorable to the government, the facts on this record— demonstrating Young’s egregious and continuing retaliatory actions against Brown, Young’s own statement about her disregard for the court order and lawsuit, and Young’s refusal to listen to co-workers who warned her about violating the order — are more than sufficient to support the district court’s conclusion that appellant’s violation of the order was willful.
 

 B.
 
 Alleged Due Process and Rule 4.2(b) Violations
 

 Appellant next argues that the government failed prior to trial to provide her with notice that one of the essential facts constituting the criminal contempt charged was a July 1995 incident in which she allegedly attempted to trip Brown. She claims that the case must be remanded to the district court to consider whether the remaining factual allegations, absent the “tripping” incident, would justify a finding of guilt beyond a reasonable doubt on the charge of criminal contempt. We review
 
 de novo
 
 to determine whether procedures comported with the Due Process Clause and with Rule 42(b) of the Federal Rules of Criminal Procedure.
 
 [12]
 

 At trial, appellant objected to admission of evidence concerning the July 21 tripping incident. She pointed out that the show cause order and attached report had not referred to the incident, but the district court nonetheless overruled her objection and allowed the government witness to testify about the tripping incident. At oral argument in this court, the government conceded that, in light of the inadequate notice given to the defendant,
 
 [13]
 
 evidence of the tripping incident should not have been considered in the adjudication of the contempt charge.
 

 Even if we assume that the district court’s decision to admit evidence of the tripping incident was error, this error is harmless beyond a reasonable doubt and does not merit reversal of the conviction on due process or Rule 42(b) grounds.
 
 See, e.g., United States v. Saro,
 
 24 F.3d 283, 287 (D.C.Cir. 1994) (“For most constitutional errors, an appellate court is to reverse if it entertains a ‘reasonable doubt’ about whether the error affected the outcome below, while noneonstitutional errors are reviewed under some laxer standard_”) (citing
 
 Chapman v. California,
 
 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967));
 
 United States v. Merlos,
 
 984 F.2d 1239, 1242 (D.C.Cir.1993) (“Even an error of constitutional dimension does not require reversal if the court finds the error harmless beyond a reasonable doubt.”). Other evidence presented at trial (including the testimony of numerous witnesses) overwhelmingly supported the allegations laid out in the special master’s report. The May 8 and May 16 incidents alone (both of which were duly included in the notice given appellant) were flagrant instances of retaliatory action taken by Young against Brown, and evidence of the tripping incident was therefore entirely unnecessary for the conviction. Moreover,. the district court found appellant’s trial testimony denying her involvement in the pivotal May 8 and May 16 incidents to be incredible. Thus, we are convinced beyond a reasonable doubt that the single oversight of failing to notify Young that the tripping incident would be addressed at trial was harmless.
 

 
 *-673
 
 III. Conclusion
 

 For the foregoing reasons, we reject appellant’s dual claims of insufficient evidence and inadequate process and therefore affirm her conviction for criminal contempt.
 

 [1]
 

 . The district court's judgment against the Department of Corrections in that case was reversed by this court.
 
 See Bonds v. District of Columbia,
 
 93 F.3d 801 (D.C.Cir. 1996).
 

 [2]
 

 . The memorandum, which was dated March 16, 1995, and which accompanied the distribution of the March 15 order to Department of Corrections employees, stated:
 

 Anyone who violates this March 15, 1995 Order ... may be found in criminal contempt of court and be fined and/or imprisoned. The court has made it extremely clear that no violations of the spirit or letter of [court orders protecting plaintiffs and witnesses] will be acceptable.
 

 The seriousness of this matter cannot be overstated. Sexual harassment and retaliation will not [be] tolerated. Each employee will be held accountable for ensuring that the D.C. Department of Corrections is a workplace that is free from all forms of discrimination, including sexual harassment and retaliation.
 

 App. A10.
 

 [3]
 

 .Copies of the
 
 Post
 
 article had been left at the Transportation Unit dispatch office on Monday, March 6, 1995, which was Brown's first day back at work after testifying.
 

 [4]
 

 . The district court announced that it would not impose a sentence of more than 180 days imprisonment if it found Young guilty of criminal contempt, so that a jury trial was not required.
 

 [5]
 

 . The statute provides that, "[a] court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as — ... (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3).
 

 Furthermore, Rule 65(d) of the Federal Rules of Civil Procedure provides that
 

 Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained;....
 

 Fed.R.Civ.P. 65(d);
 
 see, e.g., United States v. Holtzman,
 
 762 F.2d 720, 726 (9th Cir.1985) ("Ride 65(d) requires the language of injunctions to be reasonably clear so that ordinary persons will know precisely what action is proscribed.”).
 

 [6]
 

 . The record shows that appellant had completed high school and one semester of college.
 

 [7]
 

 . App. A10 (emphasis added). Appellant also argues that the court's August 9, 1995 order (which was a final order permanently enjoining employees of DOC from engaging in sexual harassment and retaliation) modified or clarified the March 15 order, proving that the first order had not clearly defined the meaning of "retaliato-xy" action. On August 9, 1995, the district court did issue a final judgment and order in the
 
 Bessye Neal
 
 litigation, permanently enjoining DOC employees from engaging in sexual harassment and retaliation, but that order specified that the March 15 order was to remain in effect pending resolution of absent class members in the
 
 Bessye Neal
 
 case.
 

 The August 9 order defined “retaliation” as follows:
 

 [Tjaking or threatening to take adverse employment actions against a person because he or she has engaged in legally protected activity.
 

 (1) Adverse employment actions include any negative change in the terms],] conditions],] or,privileges o[f] employment. It includes, for example, changes in assignments, shifts, or evaluation. It also includes creation of a hostile work environment because an employee has engaged in legally protected activity.
 

 App. 141. Although the March 15 preliminary injunction had not included an explicit definition of the meaning of "retaliatory action,” appellant’s argument is without merit. The August 1995 order did not clarify ambiguous language in the March 15 order. Rather, it merely finalized the March 15 order, specifically directing that the March 15 order should remain in effect. App. 149.
 

 [8]
 

 . Appellant also testified on her own behalf at trial, claiming that she did not understand the meaning of “retaliatory” action as used in the order, and that she did not understand that the order applied to nonsupervisory employees. The trial court found this testimony to be incredible.
 

 [9]
 

 .
 
 Cf. United States v. Turner,
 
 812 F.2d 1552, 1567 (11th Cir.1987) ("Even an egregiously vague order may be thought adequate to cover conduct so gross as to fall within its core.”),
 
 quoted in In re Holloway,
 
 995 F.2d 1080, 1082 (D.C.Cir.1993).
 

 [10]
 

 . The district court found that “the timing of the defendant’s change in attitude toward Officer Brown is strong evidence that the defendant’s behavior was caused by Brown’s testimony in this courtroom on March 3rd.” App. E5. Moreover, a number of Young's hostile comments actually mentioned or alluded to the testimony. App. E5, E6, E7.
 

 [11]
 

 .Although the court’s order forbidding such conduct was not issued until March 15, the timing of the commencement of appellant’s harassment shows quite starkly that her motive was retaliation for Brown's testimony.
 

 [12]
 

 . Rule 42(b) provides in part:
 

 A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such....
 

 Fed.R.Crim.P. 42(b).
 

 [13]
 

 . Appellant was notified approximately one week prior to her trial that the tripping incident was at issue when she received discovery materials in the case. Those materials included a report of a Federal Bureau of Investigations interview with the witness who recounted the tripping incident.