**UNITED STATES of America, Appellee,**

v.

**Anthony RAPONE, Dr. and Carlitta O. Robinson, Appellants.**

No. 96–3156.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1997.

Decided Dec. 19, 1997.

Evelina J. Norwinski, Assistant Federal Public Defender, argued the cause for appellant Anthony Rapone, with whom A.J. Kramer, Federal Public Defender, was on the briefs.

Charles B. Wayne, appointed by the court, argued the cause and filed the briefs for appellant Carlitta O. Robinson.

Vicki S. Marani, Attorney, United States Department of Justice, argued the cause for appellee, with whom John C. Keeney, Acting Assistant Attorney General, and Joseph C. Wyderko, Attorney, were on the brief.

Before: SILBERMAN, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge SILBERMAN, with whom Circuit Judge RANDOLPH joins.

SENTELLE, Circuit Judge:

Following a bench trial, appellants Anthony Rapone and Carlitta Robinson, psychologists at the District of Columbia Department of Corrections ("DOC"), were found guilty of criminal contempt for violating a court order that prohibited DOC employees from retaliating against witnesses in an ongoing sexual harassment lawsuit. They now challenge their convictions, arguing that: (1) the court order enjoining "retaliatory action" was not clear and reasonably specific; (2) the government failed to present sufficient evidence that they willfully retaliated against the employee in question; and (3) the court deprived them of their statutory right to a jury trial. We reverse appellant Robinson's conviction because we conclude that there was insufficient evidence to support the conclusion that she retaliated against the employee-witness. The government did present sufficient evidence to support a conviction of appellant Rapone, but we nonetheless vacate his conviction because we conclude that he was entitled to a trial by jury under 42 U.S.C. § 2000h.

I.

This case arises out of a class action lawsuit against DOC, in which DOC employees claimed that they were subjected to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983. *See Neal v. Director, Dist. of Columbia Dep't of Corrections,* Civil Action No. 93–2420, 1995 WL 517244 (D.D.C. Aug. 9, 1995). The district court in the *Neal* case issued a preliminary injunction on March 15,

1995, prohibiting DOC employees from "taking any retaliatory action, or making any threats of retaliatory action, against any person who has been or may be called to testify as a witness in this case, and who is listed on Exhibit A, attached hereto." One of the persons listed on Exhibit A was Deborah Bryant, a secretary in the Psychology Unit at the DOC Occoquan Facility. Bryant was considered a potential witness in the *Neal* case because she had filed administrative complaints of sexual harassment against Everitt Simms, a staff psychologist in the unit, in 1994. Simms was eventually transferred to another facility in response to Bryant's complaint.

Pursuant to the district court's instructions, DOC circulated the March 15 order to all of its employees, along with an explanatory memorandum. The memo stated that "[a]nyone who violates this March 15, 1995 Order ... may be found in criminal contempt of court and be fined and/or imprisoned. The court has made it extremely clear that no violations of the spirit or letter of [the court order] will be acceptable." *United States v. Young*, 107 F.3d 903, 905 n. 2 (D.C.Cir.1997). Both Rapone and Robinson signed a document certifying that they had read and understood the court order.

On May 1, 1995, Bryant filed a complaint with DOC against Rapone and Robinson, claiming that they had retaliated against her, in violation of the court's order, because she had filed sexual harassment charges against Simms. DOC, through the U.S. Office of Personnel Management ("OPM"), conducted an independent investigation of Bryant's complaint from May 19 to June 30, 1995. The OPM investigator concluded that "[w]hile this investigation disclosed · hostile and unprofessional behavior on the part of all three parties involved, the preponderance of evidence reflects no cause and effect between Ms. Bryant's 1994 complaints against Mr. Simms, and the dissension that currently exists between them." The investigator accordingly found "no probable cause that Ms. Bryant's complaints against Mr. Simms in 1994 triggered retaliatory actions against her by Dr. Rapone and Ms. Robinson."

At the request of Bryant's counsel, the special master in the *Neal* case reviewed the OPM report. Contrary to OPM, the special master found "probable cause to believe that Rapone and Robinson did retaliate against Ms. Bryant in violation of the March 15 injunction by casting aspersions on Ms. Bryant's performance based on her involvement in the litigation." Based on the special master's report, the district court issued an order on December 20, 1995, directing Rapone and Robinson to show cause why they should not be held in civil and criminal contempt for violating the March 15 order. The court stated that the proceeding would be a nonjury trial because the court would not "impose a criminal sentence of more than 180 days incarceration on either party."

At a subsequent status hearing, counsel for Rapone and Robinson "move[d] that the Court consider granting my clients the right to a jury trial in this proceeding." Counsel argued that a jury trial would "afford greater protection" to his clients because members of the community would have "no vested interest" in the case. The court denied their request, stating that the court had "looked at that question in connection with [a] recusal motion made in" a related case the previous day, had "decided to deny it," and would "adhere to that ruling."

Rapone and Robinson renewed their request for a jury trial immediately prior to the start of the bench trial. Counsel for appellants claimed that a jury trial would help relieve the tension inherent in a situation in which the court serves both as "the charging officer and the fact-finder." In response, the government pointed out that "a sentence of up to six months may be constitutionally imposed without a jury trial" in criminal contempt cases. The government submitted that the defendants were "not entitled to a jury trial" because the court had represented that it would not impose more than a 180–day sentence. The court subsequently denied the motion for a jury trial "based upon the case law cited by the government."

At trial, the prosecution presented evidence of incidents of harassment by Rapone and Robinson that occurred between December 1994 and May 1995. The defendants, in

response, argued that each one of the alleged incidents was a reasonable response to Bryant's deficient performance as a secretary, and that only incidents occurring after March 15 (the date of the injunction) could support criminal contempt convictions. Both sides established that there was longstanding tension between Bryant on the one hand, and Rapone and Robinson on the other. On October 30, the court found both defendants guilty of criminal contempt, in violation of 18 U.S.C. § 401(3), and sentenced each of them to fifteen days incarceration.

Appellants Rapone and Robinson now challenge their convictions on three grounds. First, they argue that the district court's March 15 order was not "clear and reasonably specific" because it did not clearly prohibit DOC employees from disciplining those who violate Department rules. Second, they claim that the evidence, even viewed in the light most favorable to the government, did not support the conclusion that Rapone and Robinson willfully retaliated against Bryant. Third, they argue that they were entitled to a jury trial under 42 U.S.C. § 2000h. We address each of these contentions in turn.

## II.

 The district court convicted appellants under 18 U.S.C. § 401, which empowers courts to "punish by fine or imprisonment, at its discretion, such contempt of its authority ... as ... [d]isobedience or resistance to its lawful ... order." 18 U.S.C. § 401(3). To support a conviction under this statute, the government must prove, beyond a reasonable doubt, that the defendants willfully violated a "clear and reasonably specific" order of the court. *United States v. NYNEX Corp.*, 8 F.3d 52, 54 (D.C.Cir.1993). Thus, a conviction for criminal contempt for violation of a court order requires that: (1) the order must be clear and reasonably specific; (2) the defendant must have violated the order; and (3) the violation must have been willful. *Young*, 107 F.3d at 907. Appellants argue that the government failed to meet its burden of proof on each of these elements.

### A. Clear and Reasonably Specific Order

 We decide whether a court order is sufficiently clear and specific by applying an objective standard, taking into account both the language of the order and the circumstances surrounding its issuance. *Young*, 107 F.3d at 907. "Whether an order is clear enough depends on the context in which it is issued and the audience to which it is addressed." *In re Levine*, 27 F.3d 594, 596 (D.C.Cir.1994) (quoting *In re Holloway*, 995 F.2d 1080, 1082 (D.C.Cir.1993), *cert. denied*, 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994)), *cert. denied*, 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995).

We note, first of all, that this court has previously concluded that the district court's March 15, 1995, order was clear and reasonably specific. In *Young*, an employee claimed that the order did not pass muster because she believed that it applied only to supervisors, and because she claimed not to understand that her hostile words and behavior would constitute "retaliatory action." 107 F.3d at 908. We concluded that the language of the order taken in conjunction with the explanatory memorandum, the document signed by the employees, and a little common sense, gave the employees sufficient notice that they could not take retaliatory action against employees because of involvement in the *Neal* litigation. 107 F.3d at 908–10. Moreover, we have also held that the permanent injunction issued by the district court, which used language similar to the order currently under review, satisfied our standards for clarity and specificity. *United States v. Roach*, 108 F.3d 1477, 1481 (D.C.Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 446, 139 L.Ed.2d 382 (1997).

Against this legal backdrop, appellants present a brief argument that the March 15 order was unsatisfactory. In their view, the order did not give them sufficient notice that disciplinary actions, taken in response to an employee's poor work performance, could be considered a violation of the court order. Their conclusion seems to be in tension with the first premise of their argument, which is that "[t]he district court's Order clearly does not prohibit the Department from disciplin-

ing those who violate Department rules, even though they may be on the protected witness list." What appellants are really arguing is that they did not engage in the sort of conduct that was prohibited by the court's March 15 order, because "retaliatory action" did not include disciplining employees who fail to perform their job responsibilities. That argument goes not to the adequacy of the court order, but to the conclusion that their conduct constituted a violation of the order, an issue subsumed in their later argument attacking the sufficiency of the evidence to support their convictions. As to the clarity of the order, we again conclude that the court's March 15, 1995, order clearly and with reasonable specificity prohibited DOC employees from retaliating against witnesses in the *Neal* case.

### B. Retaliation

Appellants also claim that there was insufficient evidence to conclude that they retaliated against Bryant because of her involvement in the *Neal* litigation. We review the sufficiency of the evidence *de novo,* and we view the facts in the light most favorable to the government. *Young,* 107 F.3d at 907. We apply the "familiar standard for any criminal conviction," asking whether "a fair-minded and reasonable trier of fact could accept the evidence as probative of a defendant's guilt beyond a reasonable doubt." *In re Ellenbogen,* 72 F.3d 153, 157 (D.C.Cir. 1995) (internal punctuation and citation omitted).

█ Reviewing the evidence under this standard, we conclude that the government presented sufficient evidence to support a finding that appellant Rapone retaliated against Bryant in violation of the injunction. We rest our conclusion principally on the negative performance evaluation submitted by Rapone. According to Joseph Tisdale, the former deputy warden of programs at the Occoquan facility, Rapone informed him in April 1995 that he planned to submit a negative performance evaluation of Bryant for the year ending March 31, 1995. Tisdale, who was serving as Rapone's supervisor at the time, responded that such a submission would violate DOC procedures, because an employee who is to receive an unsatisfactory rating must receive notice 90 days in advance, must be informed of the specific deficiencies, and must be given the chance to correct them. Tisdale instructed Rapone not to submit an evaluation of Bryant, and told him that he would do the evaluation himself. Rapone, however, disregarded his supervisor's instructions and submitted an evaluation that was highly critical of Bryant. Tisdale directed Rapone to retract the evaluation, but Rapone refused to comply. Tisdale accordingly recommended to the warden that he be suspended without pay for insubordination.

Rapone's negative depictions of Bryant's work performance were in considerable tension with the views of Bryant held by some of the other employees in the unit. Tisdale, for example, gave Bryant positive marks on a performance evaluation, and testified that she was a "very good" secretary. Dale Schulz, a DOC employee who briefly worked at Occoquan, similarly testified that Bryant's performance was equal to that of other secretaries at DOC.

The government presented sufficient evidence that Rapone's hostile behavior toward Bryant was motivated, not by her work performance, but by her involvement in the sexual harassment case. Rapone was well aware that Bryant had made sexual harassment allegations against Simms, and that Bryant had made similar allegations against another DOC employee in 1989. After the departure of Simms, Rapone appeared preoccupied with Bryant's protected status. In conversations with other employees, he repeatedly made reference to the fact that she was on a protected list, and expressed dismay that something couldn't be done about her. He told his co-workers that she was a bad secretary, and blamed her poor work performance on her status as a protected witness. Rapone told Tisdale, for example, that "part of the reason that she gets away with murder, so to speak, is because she's on the list." All the while, Rapone and Bryant

were involved in a series of confrontations in the months leading up to the March 15 order. Bryant testified that she was singled out for negative treatment—Rapone restricted her lunch breaks, prevented her from covering her office window, and removed her computer and locked it in an unoccupied office. Although these incidents predate the court's order, they can be construed to shed some light on Rapone's state of mind in the events after March 15.

We conclude that Rapone's criticism of Bryant's work performance, when viewed in the light most favorable to the government, could be construed by a reasonable factfinder as an example of retaliation. Rapone went out of his way to disparage Bryant's performance as a secretary, voicing negative opinions of her work not shared by at least two other employees in the unit. Rapone also drew attention to her protected status, and claimed that she thought that she could get away with anything because of her involvement in the *Neal* litigation. Based upon this record, a factfinder could reasonably conclude that Rapone disparaged Bryant's work product because of her involvement in the ongoing sexual harassment case.

We reach a different conclusion as to appellant Robinson. Unlike Rapone, Robinson did not submit a performance evaluation of Bryant. What the government does allege, however, is that Robinson engaged in a pattern of harassment of Bryant because of her participation in the *Neal* litigation. We conclude that the evidence, even when viewed in the light most favorable to the government, does not support the government's allegations.

The government's case against Robinson was based almost exclusively upon the testimony of Tisdale. He claimed that Robinson, along with Rapone, "continuously went around telling people that Ms. Bryant's work performance was unsatisfactory." In his view, the situation "got worse" after March 15. When asked to give examples of specific incidents of retaliation that occurred after March 15, Tisdale responded:

[T]here were numerous occasions [when] they were saying that Ms. Bryant was not available at her work station. There were numerous times that they allowed individuals into her office to use her work area, and things were missing from her work area when she returned. There was [sic] numerous times that statements were being made around the institution that Ms. Bryant was not doing her work, Ms. Bryant was all over the institution. There was [sic] numerous times where I had to go down to the Psychological Unit where Ms. Robinson was shouting at Ms. Bryant, and I had to call the whole Psychological Unit together to resolve that particular matter.

We conclude that the evidence against Robinson was insufficient to support the conclusion that she retaliated against Bryant for her involvement in the sexual harassment case. Unlike the case against Rapone, the case against Robinson was based upon vague descriptions of conduct that occurred over a several-week time span. Tisdale provided remarkably few specifics about the events that he alleged were retaliatory—a factfinder would be left wondering who was involved, on what dates, and under what circumstances. While Tisdale's testimony may give a flavor of what transpired, one cannot determine whether Robinson's statements and actions were retaliatory without knowing what was said, to whom, and in what context. For example, telling other employees that Bryant was not at her work station, and allowing them to use her work area in her absence, may or may not constitute retaliatory conduct, depending on the circumstances. A factfinder could not determine, based upon this evidence alone, whether Robinson's behavior was in retaliation for Bryant's involvement in the *Neal* litigation. At oral argument, counsel for the United States adamantly insisted that there was sufficient evidence to support Robinson's conviction. But when the panel repeatedly pressed her for specific examples, she only repeated conclusory generalizations, that appellant had engaged in retaliatory conduct.

We conclude that something more was required to support a finding that Robinson was guilty of criminal contempt.

### C. Willful Violation

■ The third requirement for a conviction of criminal contempt is that the violation of the court order must have been willful. *Young,* 107 F.3d at 907. A defendant commits a willful violation when he acts with deliberate or reckless disregard of the obligations created by a court order. *Id.* at 909; *Holloway,* 995 F.2d at 1082.

■ The government presented abundant evidence from which a reasonable factfinder could conclude that Rapone's alleged violation of the March 15 order was willful. Rapone was well aware of Bryant's protected status, having received a copy of the court's order and an explanatory memorandum from DOC. According to the testimony of his superior, Tisdale, Rapone continued to harass Bryant after issuance of the court order, prompting Tisdale to give him both verbal and written warnings to refrain from retaliatory conduct. Shortly thereafter, Rapone informed Tisdale of his intention to submit a negative performance evaluation of Bryant. Tisdale told him that such a submission would violate DOC procedures, and directed him not to submit any evaluation of Bryant. Rapone, however, defied his supervisor's instructions and submitted a negative evaluation, prompting Tisdale to cite him for insubordination. Viewed in the light most favorable to the government, Rapone's remarkable persistence in submitting a negative evaluation of Bryant, combined with repeated warnings to obey the court's order, could lead a reasonable factfinder to conclude that appellant's violation of the March 15 order was willful.

### III.

Appellant Rapone also challenges his conviction on the grounds that he was deprived his statutory right to a jury trial. The basis for his claim is an obscure statutory provision, 42 U.S.C. § 2000h, which provides: "In any proceeding for criminal contempt arising under title II, III, IV, V, VI, or VII of this Act, the accused, upon demand therefor, shall be entitled to a trial by jury, which shall conform as near as may be to the practice in criminal cases." 42 U.S.C. § 2000h. The plain language of this provision reveals only two requirements: the case must arise under titles II through VII of the Civil Rights Act of 1964, and the accused must "demand" a trial by jury.

The first requirement is readily satisfied in this case. The plaintiffs in the *Neal* litigation alleged, *inter alia,* that DOC had engaged in a pattern of sexual harassment in violation of Title VII of the Civil Rights Act of 1964. *See Bonds v. District of Columbia,* 93 F.3d 801, 804 (D.C.Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). The district court issued an order on March 15 to protect participants in the litigation from retaliation, and Rapone is presently accused of violating that court order. The criminal contempt proceeding against Rapone is thus a case "arising under" Title VII of the Civil Rights Act.

■ The more difficult question is whether Rapone made a "demand" for a jury trial within the meaning of the statute. The statements made by appellants' counsel to the district court resemble an appeal to the court's discretion more than an assertion of right. At the status conference, counsel for Rapone and Robinson asked "that the Court allow us to have a jury trial as opposed to a non-jury trial." He explained that "it would afford greater protection to my client[s] if we could have a jury trial," because members of the community who have "no vested interest" would decide the case. After making the point that a jury trial would not be unduly burdensome, the attorney "move[d] that the Court consider granting my clients the right to a jury trial in this proceeding." The attorney renewed the "motion for the trial by jury" at the beginning of the bench trial, and twice referred to the motion as a "request." He stated: "I think that the case law is silent on contempt cases where the Court is in fact the charging officer and the fact-finder, and to the best of my knowledge, that issue, in

terms of that being a basis for recusal, has not been reached. And another way around it would be to grant our request for a jury trial." Standing alone, these statements by appellants' coun,el could be viewed as lacking the sense cf entitlement that one would expect from a "demand" for a jury trial.

Interestingly enough, both the district court and the counsel for the United States understood appellants' statements not as a request, but as an assertion of constitutional right. The district court denied appellants' motion at the status conference, explaining that the court had "looked at that question in connection with the recusal motion made in the *Roach* case yesterday, and decided to deny it in that case, and I think that I'll adhere to that ruling here as well." The defendants in the *Roach* case argued, among other things, that they had a constitutional right to a jury trial under the Sixth Amendment. *See Roach,* 108 F.3d at 1484. After appellants renewed their motion at the bench trial, counsel for the United States responded that "it's well settled that [in] a criminal contempt case, a sentence of up to six months may be constitutionally imposed without a jury trial." The government submitted that the defendants were "not entitled to a jury trial" because the court had already decided not to impose a sentence exceeding 180 days. The district court denied appellants' motion "based upon the case law cited by the government."

Even though appellants' statements, viewed in isolation, might appear to be something other than a "demand," we find it significant that both the district court and the attorney for the United States understood appellants to be arguing that they were constitutionally entitled to a jury trial. Both explained that the Constitution's guarantee did not apply in the present case. As their responses reveal, they believed that appellants were asserting a legal right to a jury trial, albeit a right derived from the Constitution, rather than the statute at hand. Given their uniform interpretation of appellants' repeated requests, we conclude that appellants made an adequate "demand" for a jury trial within the meaning of 42 U.S.C. § 2000h.

Counsel for the United States does not dispute that the statutory provision is applicable to this type of case. Indeed, the government concedes that "appellants could have obtained a jury trial under Section 2000h if they had invoked that provision in a timely manner, i.e., when it was clear that the district court had overlooked it." But the government argues that appellants are precluded from asserting a statutory right to a jury trial at this juncture because they never brought the statute to the attention of the district court. Rapone concedes that he never mentioned the statute when he raised the issue of a jury trial in the court below.

The issue, then, is whether Rapone surrendered his statutory right to a jury trial because he did not bring the statute to the district court's attention during his repeated requests for a jury trial. We hold that he did not. This case is distinguishable from cases in which a litigant attempts to raise an entirely new claim or new issue on appeal. In such cases, "issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084 (D.C.Cir.1984). We have made exceptions to this rule only in "exceptional circumstances." *Id.* at 1085. In the present case, Rapone is not attempting to raise the issue of a jury trial for the first time on appeal. Rather, he simply offers new legal authority for the position that he repeatedly advanced before the district court—that he was entitled to have his case tried before a jury.

We find instructive the Supreme Court's discussion of a similar problem in *Elder v. Holloway,* 510 U.S. 510, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). The underlying suit involved a damages action against police officers under 42 U.S.C. § 1983, for injuries sustained during the course of an arrest. The district court granted summary judgment to the defendants on qualified immunity grounds, concluding that their conduct did not violate clearly established statutory or constitutional rights that a reasonable person

would have known. On appeal, the Ninth Circuit stumbled upon a relevant precedent that the district court and the parties had overlooked. The Court of Appeals nonetheless refused to consider the precedent because it believed that the case had been discovered too late. Upon review, the Supreme Court reversed the Ninth Circuit for turning a blind eye to pertinent legal authority. As the Court explained, when an appellate court reviews a question of law *de novo*, the court must use its " 'full knowledge of its own [and other relevant] precedents.' " *Id.* at 516, 114 S.Ct. at 1023 (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n. 9, 104 S.Ct. 3012, 3018 n. 9, 82 L.Ed.2d 139 (1984)). Ignoring relevant precedents discovered on appeal could "occasion appellate affirmation of incorrect legal results" and could result in a windfall to a party "because of shortages in counsel's or the court's legal research or briefing." *Id.* at 515 & n. 3, 114 S.Ct. at 1023 & n. 3. The Court concluded that appellate review of qualified immunity dispositions must be conducted "in light of all relevant precedents, not simply those cited to, or discovered by, the district court." *Id.* at 512, 114 S.Ct. at 1021.

While not squarely on point, *Elder* is instructive in the case at bar. As in *Elder*, both the district court and the parties overlooked pertinent legal authority that would have shed light on the issue. Whether Rapone was entitled to a jury trial is a question of law that we review *de novo*, and we do not think it appropriate to ignore relevant legal authority simply because it was not considered in the court below. If it would be improper to absolve civil defendants "because of shortages in counsel's or the court's legal research or briefing," *id.* at 515, 114 S.Ct. at 1023, then surely we should not affirm a criminal conviction that suffers from the same sort of deficiency.

Contrary to the government's interpretation, the statute does not require an explicit invocation of the provision before the district court. What it does require is a "demand" for a jury trial, and we have concluded that appellants' repeated requests for a trial by jury amounted to such a demand, especially considering that both the district court and the government construed the requests as an assertion of right. We conclude that Rapone's otherwise meritorious argument was not waived by his failure to provide a citation to the proper legal authority.

## IV.

In conclusion, we reverse appellant Robinson's conviction and remand her case to the district court for entry of a judgment of acquittal because the government failed to present sufficient evidence that she committed an act of retaliation in violation of the court's March 15 order. We vacate appellant Rapone's conviction on the grounds that he had a statutory right to jury trial under 42 U.S.C. § 2000h.

SILBERMAN, Circuit Judge, concurring, with whom RANDOLPH, Circuit Judge, joins:

I write separately to emphasize the point that in reviewing convictions for sufficiency of the evidence we cannot look only to the evidence supporting the government. Although the government is entitled to any reasonable inferences, we must consider all of the evidence including that favorable to the defendant. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (noting that "upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution"); *United States v. Grey Bear*, 828 F.2d 1286, 1292 (8th Cir.1987) (reviewing "the evidence taken as a whole, including that offered by the defendant"); *United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980) (stating that "[t]he standard is not so strict that the defendant's evidence must be disregarded").

In that vein, it is clear, as the OPM investigator concluded, that there was long-standing acrimony between Rapone, Robinson, and Bryant which pre-dated both Bryant's complaints against Simms and her involvement in the *Neal* litigation. From the time of her arrival in the Psychology Unit, Rapone and

198

Robinson complained in memos about Bryant's alleged extended absences from her desk, failure to answer the telephone, excessive socialization with prisoners, and use of an audio cassette recorder to tape a conversation with a superior. The testimony of co-workers, such as Dr. Caitilin Gordon and Abdolmozafar Nahidi, further supports the view that relations between Rapone, Robinson, and Bryant were hostile for reasons independent of Bryant's sexual harassment complaints.

Rapone (and Robinson), moreover, were hardly alone in criticizing Bryant's work performance. Gordon observed that Bryant came into work late, spent a lot of time away from her desk, interacted socially with the inmates, and was generally unproductive. Nahidi noted that Bryant would refuse to answer the telephones when she was typing. And Halil Alturk asserted that Bryant would spend an inordinate amount of time during the day outside of the office. The OPM investigator concluded that "there have been serious deficiencies in Ms. Bryant's work performance" and that "no linkage" existed between the retaliatory incidents alleged by Bryant and her role in Simms' removal from the unit. It is also noteworthy that Rapone did not single Bryant out by giving her a negative job evaluation in 1995. At the same time Rapone turned in Bryant's evaluation, he submitted a negative evaluation of Nahidi, a psychologist with no involvement in the *Neal* litigation, also against Tisdale's orders.

The issue before us is close. The government conceded at oral argument that it had the burden of showing that Rapone submitted the unfavorable evaluation of Bryant *because* of her sexual harassment complaints. Still, although there is considerable evidence supporting the defense, I believe a rational fact-finder could be persuaded by the countervailing evidence described in the majority opinion. I therefore concur.