**<u>PUBLISHED</u>**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4193**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DONALD L. BLANKENSHIP,

Defendant - Appellant.

-----------------------------------------------------

ILLINOIS COAL ASSOCIATION; OHIO COAL ASSOCIATION; WEST VIRGINIA COAL ASSOCIATION,

Amici Curiae.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.  Irene C. Berger, District Judge.  (5:14-cr-00244-1)

Argued:  October 26, 2016            Decided:  January 19, 2017

Before GREGORY, Chief Judge, WYNN, Circuit Judge, and DAVIS, Senior Circuit Judge.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Gregory and Senior Judge Davis joined.

―――――――――

**ARGUED:** William Woodruff Taylor, III, ZUCKERMAN SPAEDER LLP, Washington, D.C., for Appellant. Steven Robert Ruby, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Michael R. Smith, Eric R. Delinsky, ZUCKERMAN SPAEDER LLP, Washington, D.C., for Appellant. Carol A. Casto, United States Attorney, R. Gregory McVey, Gabriele Wohl, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. Christopher A. Brumley, Jeffrey M. Wakefield, Nathaniel K. Tawney, Wesley P. Page, Bradley J. Schmalzer, FLAHERTY SENSABAUGH BONASSO PLLC, Charleston, West Virginia, for Amici Curiae.

―――――――――

WYNN, Circuit Judge:

Defendant Donald Blankenship ("Defendant"), former chairman and chief executive officer of Massey Energy Company ("Massey"), makes four arguments related to his conviction for conspiring to violate federal mine safety laws and regulations. After careful review, we conclude the district court committed no reversible error. Accordingly, we affirm.

I.

This case arises from a tragic accident on April 5, 2010 at the Upper Big Branch coal mine in Montcoal, West Virginia, which caused the death of 29 miners. Massey owned and operated the Upper Big Branch mine.

In the years leading up to the accident, the federal Mine Safety & Health Administration (the "Mine Safety Administration") repeatedly cited Massey for violations at the Upper Big Branch mine of the Mine Safety & Health Act of 1977, 30 U.S.C. § 801 *et seq.* (the "Mine Safety Act"), and its implementing regulations.[1] In 2009 alone, the Mine Safety Administration identified 549 violations at the Upper Big Branch mine. Indeed, in the 15 months preceding the April 2010 accident, the Upper Big Branch mine received the third-most serious safety citations of any mine in the United States. Many of these violations related to improper ventilation and

---

[1] Because the jury convicted Defendant, we recite the evidence in the light most favorable to the government.

accumulation of combustible materials—problems that were key contributing factors to the accident. Defendant was aware of the violations at the Upper Big Branch mine in the years leading up to the accident, receiving daily reports showing the numerous citations for safety violations at the mine.

Not only did Defendant receive daily reports of the safety violations, beginning in mid-2009, but Defendant also received warnings from a senior Massey safety official about the serious risks posed by the violations at Upper Big Branch. And the safety official informed Defendant that "[t]he attitude at many Massey operations is 'if you can get the footage, we can pay the fines.'" J.A. 1907. Evidence suggested that Defendant had fostered this attitude by directing mine supervisors to focus on "run[ning] coal" rather than safety compliance and to forego construction of safety systems. J.A. 1902, 1924. Defendant also told the Massey employee in charge of the Upper Big Branch mine that "safety violations were the cost of doing business" and that it was "cheaper to break the safety laws and pay the fines than to spend what would be necessary to follow the safety laws." J.A. 790-91.

Notwithstanding the numerous citations and warnings, Defendant had a "policy to invariably press for more production even at mines that he knew were struggling to keep up with the safety laws." J.A. 793. For example, Defendant directed the supervisor of Upper Big Branch to reopen a mine section to production even though it lacked a legal return airway. Additionally, Massey employees

4

advised Defendant that the lack of adequate staff was a key factor in the high number of safety violations at Upper Big Branch. Contrary to this advice, Massey reduced staff at the Upper Big Branch mine less than two months before the accident, a decision that Defendant would have had to approve given his close supervision of mine operations and staffing.

On November 13, 2014, a federal grand jury indicted Defendant for: (1) conspiring to willfully violate federal mine safety laws and regulations; (2) conspiring to defraud federal mine safety regulators; (3) making false statements to the Securities & Exchange Commission regarding Massey's safety compliance; and (4) engaging in securities fraud. The grand jury issued a superseding three-count indictment (the "Superseding Indictment") on March 10, 2015, which combined the conspiracy counts into a single, multi-object conspiracy charge and included additional factual allegations. Following a six-week trial, a jury convicted Defendant of conspiring to violate federal mine safety laws and acquitted him of the remaining indicted offenses. The district court sentenced Defendant to one year imprisonment and assessed a $250,000 fine, both of which were the maximum permitted by law. Defendant timely appealed.

On appeal, Defendant argues that the district court: (1) erroneously concluded that the Superseding Indictment sufficiently alleged a violation of Section 820(d); (2) improperly denied Defendant the opportunity to engage in re-cross examination

of an alleged co-conspirator; (3) incorrectly instructed the jury regarding the meaning of "willfully" in 30 U.S.C. § 820(d), which makes it a misdemeanor for a mine "operator" to "willfully" violate federal mine safety laws and regulations; and (4) incorrectly instructed the jury as to the government's burden of proof. We address each argument in turn.

## II.

First, Defendant argues that the district court erred in refusing to dismiss his indictment. When, as here, a defendant challenges the sufficiency of an indictment prior to verdict, we review the sufficiency of the indictment de novo, "'apply[ing] a heightened scrutiny' to ensure that every essential element of an offense has been charged." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (quoting *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009)).

To satisfy the Fifth and Sixth Amendments, "[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *Id.* Under this standard, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] intended to be punished." *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). To the extent an

6

indictment relies on a "general description based on the statutory language," the indictment also should include "a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description." *Id.* (quoting *Hamling*, 418 U.S. at 117-18).

The jury convicted Defendant of conspiring to violate 30 U.S.C. § 820(d), which, in pertinent part, makes it unlawful for "[a]ny operator [to] willfully violate[] a mandatory [mine] health or safety standard." The Superseding Indictment alleged that Defendant was "an operator[] of [Upper Big Branch]," and in that capacity, conspired to "routinely violate federal mandatory mine safety and health standards." J.A. 138. Accordingly, the indictment "set forth the offense in the words of the statute itself," which is generally sufficient. *Perry*, 757 F.3d at 171.

Notwithstanding that the Superseding Indictment tracked the language of the statute, Defendant asserts the Superseding Indictment was insufficient because it did not cite the specific mine safety regulations that he allegedly conspired to violate. We disagree.

As detailed above, when an indictment uses a "general description based on the statutory language," the indictment satisfies the Constitution if it includes an accompanying statement of facts that apprises a defendant of the specific offense the government alleges the defendant committed. *Id.* at 171. Here, as the district court correctly noted, although the Superseding Indictment did not include citations to

7

specific regulations, it included a thirty-page factual background that identified numerous mine safety regulations that Defendant allegedly conspired to violate, including: (1) mine ventilation regulations, (2) mine-safety examination requirements, (3) regulations regarding support of roof and walls, and (4) regulations governing accumulation of explosive coal dust. The Superseding indictment also detailed how Defendant conspired to violate these and other regulations.

Defendant cites no authority holding that an indictment is insufficient for failing to include specific regulatory citations when the indictment describes at length which regulations the defendant violated and how he violated those regulations. And the two cases upon which Defendant principally relies—*United States v. Hooker* and *United States v. Kingrea*—are readily distinguishable.

In *Hooker*, this Court found an indictment insufficient when it failed to include an essential statutory element of the offense—that the conduct at issue affected interstate commerce. 841 F.2d 1225, 1227-28 (4th Cir. 1988). By contrast, the Superseding Indictment tracked the statutory language verbatim. In *Kingrea*, the indictment again omitted an essential statutory element of the crime, and this omission "broaden[ed] the character of the crime beyond the scope of the crime as Congress has defined it in the applicable statute." 573 F.3d at 192. Here, not only did the Superseding Indictment track the statutory language, it also did not broaden

8

the scope of the offense. Accordingly, the district court did not err in refusing to dismiss the Superseding Indictment.

III.

Second, Defendant argues that the district court violated his rights under the Sixth Amendment Confrontation Clause by denying him the opportunity to engage in recross-examination of Chris Blanchard, the Massey employee in charge of the Upper Big Branch mine. The governing rule is that "[w]here new evidence is opened up on redirect examination, the opposing party must be given the right of cross-examination on the new matter, but the privilege of recross-examination as to matters not covered on redirect examination lies within the trial court's discretion." *United States v. Riggi*, 951 F.2d 1368, 1375 (3d Cir. 1991) (quotation omitted); *see also United States v. Fleschner*, 98 F.3d 155, 158 (4th Cir. 1996) ("[I]f a new subject is raised in redirect examination, the district court must allow the new matter to be subject to recross-examination.").

Although there is no bright line rule delineating what constitutes "new matter," testimony elicited on redirect does not amount to "new matter" if the testimony only "expand[s] or elaborate[s] on the witness' previous testimony." *United States v. Baker¸* 10 F.3d 1374, 1404-05 (9th Cir. 1993) (noting that "the authorities are devoid of any analysis of what constitutes 'new matter.'"), *overruled in part on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000).

By contrast, redirect testimony raises "new matter" when it encompasses a subject outside of the scope of direct examination or when a witness offers materially different testimony regarding a subject first introduced on direct. *See, e.g.*, *id.* at 1405 (concluding redirect raised new matter when witness testified on redirect that flask could produce significantly more methamphetamine than the amount he had testified it could produce on direct); *United States v. Jones*, 982 F.2d 380, 384 (9th Cir. 1992) (holding redirect testimony that, for the first time, placed defendant at crime scene constituted new matter); *United States v. Caudle*, 606 F.2d 451, 457-59 (4th Cir. 1979) (concluding redirect raised new matter when witness first testified to substance of report on redirect, even though witness had testified as to preparation and dissemination of report on direct).

Here, in reviewing whether the redirect examination raised new matter, the district court commendably received oral argument and, in concluding that redirect did not raise new matter, thoroughly reviewed the transcript of direct, cross, and redirect and explained how each issue raised on redirect did not constitute new matter. Defendant principally argues that the district court improperly denied him the opportunity to recross-examine Blanchard regarding (1) his testimony on redirect that he testified before the grand jury that Defendant told Blanchard that it was "cheaper to break the safety laws and pay the fines" than comply, J.A. 790, and (2)

10

a number of safety citations first introduced on redirect to rebut Blanchard's testimony on cross-examination that many citations did not reflect serious violations.

Assuming *arguendo* that the district court erred, after completing its thorough review, in denying recross-examination on those subjects, we conclude any such error was harmless beyond a reasonable doubt. *See Baker*, 10 F.3d at 1405 ("Reversal is not required if, assuming the damaging potential of recross-examination were fully realized, we can say that the error was harmless beyond a reasonable doubt."). "Factors to consider in determining harmlessness include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Id.* at 1405-06 (internal quotation marks omitted).

Here, although Blanchard was an important witness, all of the subjects on which Defendant requested recross-examination were either effectively dealt with on cross-examination or cumulative of other evidence introduced at trial. For instance, on cross-examination, Blanchard testified unambiguously that he did not conspire with Defendant to violate mine safety laws, and Blanchard testified that the government threatened to prosecute him if he did not testify before the grand jury, during which he inculpated Defendant. J.A. 519-20. Likewise, both Defendant and

the government introduced numerous safety citations at Upper Big Branch, through Blanchard and other witnesses.

Furthermore, Defendant's cross-examination of Blanchard lasted nearly five days—more time than direct and redirect examination combined—and therefore Defendant had an extensive opportunity to examine Blanchard. The government also presented other evidence and testimony that would allow the jury to determine Defendant prioritized coal production at the expense of safety compliance, including memoranda from Defendant to Massey employees and statements from Defendant to Blanchard. *See, e.g.*, J.A. 1157-58 (Defendant telling Blanchard to reopen mine section even though it lacked legal return airway); J.A. 1902 (Defendant telling supervisors to "run coal" and not "build overcasts," which are ventilation systems); J.A. 1924 ("You need to . . . run some coal. We'll worry about ventilation or other issues at an appropriate time."). And the government presented other evidence establishing that the citations reflected serious safety violations.

Most significantly, Defendant could have recalled Blanchard as a witness later in the trial. *United States v. Gibson*, 187 F.3d 631, 1999 WL 543220, at \*5-6 (4th Cir. July 27, 1999) (table) (holding denial of recross harmless because defendant could recall witness); *United States v. Ross*, 33 F.3d 1507, 1518 (11th Cir. 1994) (same); *Hale v. United States*, 435 F.2d 737, 752 n.22 (5th Cir. 1970) (holding denial of recross did not violate Confrontation Clause when defendant had opportunity to

12

recall witness). Accordingly, the district court did not reversibly err in denying Defendant an opportunity to engage in recross-examination of Blanchard.

IV.

Next, Defendant argues that the district court errantly instructed the jury regarding the meaning of "willfully" violating federal mine safety and health standards for purposes of 30 U.S.C. § 820(d). This Court reviews de novo "whether the district court's instructions to the jury were correct statements of law." *Gentry v. E. W. Ptrs. Club Mgmt. Co. Inc.*, 816 F.3d 228, 233 (4th Cir. 2016) (quotation omitted). "In conducting such a review, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *United States v. Jefferson*, 674 F.3d 332, 351 (4th Cir. 2012) (internal quotation omitted).

Defendant takes issue with the following instructions regarding the meaning of "willfully" in Section 820(d):

1.    A person with supervisory authority at or over a mine willfully fails to perform an act required by a mandatory safety or health standard if he knows that the act is not being performed and knowingly, purposefully, and voluntarily allows that omission to continue.

2.    A person with supervisory authority at or over a mine also willfully violates a mandatory mine safety or health standard if he knowingly, purposefully, and voluntarily takes actions that he knows will cause a standard to be violated[;]

13

3. [O]r knowingly, purposefully, and voluntarily fails to take actions that are necessary to comply with the mandatory mine safety or health standard[;]

4. [O]r if he knowingly, purposefully, and voluntarily takes action or fails to do so with reckless disregard for whether that action or failure to act will cause a mandatory safety or health standard to be violated.

J.A. 1555-57.

## A.

Defendant first argues that the fourth instruction improperly allowed the jury to convict Defendant for "reckless" conduct, rather than requiring the government to prove Defendant "knew his conduct would cause a violation of safety regulations . . . and was unlawful." Appellant's Br. at 44. In particular, Defendant contends that the Supreme Court's decisions in *Bryan v. United States*, 524 U.S. 184 (1998), and *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), bar courts from defining "willfully" in criminal statutes in terms of "reckless disregard."

## 1.

In *Bryan*, the Supreme Court reviewed whether the government introduced sufficient evidence to convict the defendant of "willfully" violating the federal Gun Control Act, which, among other things, prohibits dealing in firearms without a license. 524 U.S. at 189; *see also* 18 U.S.C. § 924(a)(1)(D). The defendant argued that in order to prove that he "willfully" violated federal gun laws, the government had to introduce evidence that "he was aware of the federal law that prohibits dealing

14

in firearms without a federal license." 524 U.S. at 189. The Supreme Court rejected the defendant's argument, holding that, as a result of the long-standing principle that ignorance of the law is no excuse, the government need not prove that the defendant knew of the statutory provision at issue to violate it. *Id.* at 196.

In reaching this conclusion, the Court noted that "willfully" is "a word of many meanings whose construction is often dependent on the context in which it appears." *Id.* at 191 (internal quotation omitted). The Court said that, "[a]s a general matter," in the criminal context, "willful" means an act "undertaken with a 'bad purpose,'" and a "'willful' violation of a statute" occurs when "'the defendant acted with knowledge that his conduct was unlawful.'" *Id.* at 191-92 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). The Court provided several additional examples of criminally "willful" conduct, including: (1) acting "without justifiable excuse"; (2) acting "stubbornly, obstinately, perversely"; (3) acting "without ground for believing it is lawful"; and (4) acting with "careless disregard [as to] whether or not one has the right so to act." *Id.* at 191 n.12.

*Safeco* involved a civil action under Section 1681n of the Fair Credit Reporting Act, which establishes a cause of action against entities that "willfully" fail to comply with the statute. 551 U.S. at 56-57. The Supreme Court rejected the defendant's argument that willfully limited liability to "acts known to violate the Act, not to reckless disregard of statutory duty." *Id.* at 57. In reaching this

15

conclusion, the Court said that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Id.* The Court further noted that, as explained in *Bryan*, in the criminal context "willfully" often requires the government to prove a defendant to have a "'bad purpose'" or to have "'acted with knowledge that his conduct was unlawful.'" *Id.* at 57 n.9 (quoting *Bryan*, 524 U.S. at 191-93).

Neither *Bryan* nor *Safeco* supports Defendant's position that reckless disregard cannot amount to criminal willfulness. In particular, *Bryan* and *Safeco* emphasized that "willful" has multiple meanings and that the "bad purpose" language upon which Defendant relies defines willful only as a "general matter"— i.e. not in all circumstances. Additionally, even if *Bryan* and *Safeco* had required a showing that a Defendant acted with a "bad purpose"—which they did not—the Supreme Court long ago recognized—in a decision relied on in *Bryan*—that "reckless disregard" can amount to acting with a "bad purpose" for purposes of criminal "willfulness." *Screws v. United States*, 325 U.S. 91, 101-04 (1945) (plurality op.).[2] And *Bryan*—upon which *Safeco* entirely relied—expressly

---

[2] Although the Supreme Court did not issue a majority opinion in *Screws*, this Court and other Circuits have treated the definition of "willfulness" in Justice Douglas' plurality opinion—which encompasses "reckless disregard"—as controlling. *See, e.g.*, *United States v. Mohr*, 318 F.3d 613, 619 (4th Cir. 2003); *United States v. Bradley*, 196 F.3d 762, 769 (7th Cir. 1999); *United States v. Johnstone*, 107 F.3d 200, 207-08 (3d Cir. 1997).

recognized that "conduct marked by careless disregard" constitutes "willfulness." 524 U.S. at 191 n.12. Accordingly, *Bryan* and *Safeco* did not overturn longstanding Supreme Court precedent holding that reckless disregard can amount to criminal willfulness.

We further point out that this Court repeatedly has held, post-*Bryan* and *Safeco*, that "reckless disregard" and "plain indifference" can constitute criminal "willfulness." For example, in a decision addressing the meaning of "willfully" in the civil and criminal penalty provisions in federal gun control laws,[3] we concluded that "[a]t its core [willful] describes conduct that results from an exercise of the will, distinguishing 'intentional, knowing, or voluntary' action from that which is 'accidental' or inadvertent." *RSM, Inc. v. Herbert*, 466 F.3d 316, 320 (4th Cir. 2006). Accordingly, "when determining the willfulness of conduct, we must determine whether the acts were committed in deliberate disregard of, *or with plain indifference toward*, either known legal obligations or the general unlawfulness of the actions." *Id.* at 321-22 (emphasis added). We further held that this construction

---

[3] *RSM* was a civil action under the Gun Control Act contesting the revocation of a firearms license under 18 U.S.C. § 923(e). 466 F.3d at 321 n.1. Although *RSM* interpreted Congress' use of willfully in a civil provision, we held its interpretation of "willful" also applied to Section 924(a)(1)(D), the provision interpreted by the Supreme Court in *Bryan*. *Id.*

17

of "willfully" was "in accordance with *Bryan*'s construction of the term in the *criminal* context of § 924(a)(1)(D)." *Id.* at 321 n.1 (emphasis added).

Applying this standard to the conduct at issue, we held that the defendant's repeated failure to comply with federal gun laws in the face of warnings by federal officials amounted to "willfulness":

> To be sure, a single, or even a few, inadvertent errors in failing to complete forms may not amount to "willful" failures, even when the legal requirement to complete the form was known. Yet *at some point*, when such errors continue or even increase in the face of repeated warnings given by enforcement officials, accompanied by explanations of the severity of the failures, one may infer as a matter of law that the licensee simply does not care about the legal requirements. *At that point*, the failures show the licensee's plain indifference and therefore become willful.

*RSM,* 466 F.3d at 322 (emphasis retained). Thus, we have held that "not car[ing]" about adherence to legal requirements amounts to criminal "willfulness," which is what the fourth instruction stated here. Notably, *RSM*'s description of the defendant's willful conduct tracks the government's theory of the case here: Defendant was repeatedly informed of safety violations at Upper Big Branch, and notwithstanding that knowledge, Defendant chose to prioritize production and pay fines rather than to take steps necessary to prevent the safety violations from continuing.

Following *RSM*, which post-dated *Bryan* but pre-dated *Safeco*, we held that *Safeco* did not call into question *RSM*'s analysis of the meaning of "willfully." *Am.*

18

*Arms Int'l v. Herbert*, 563 F.3d 78, 85-86 (4th Cir. 2009). Additionally, in *American Arms*, we expressly equated "plain indifference" with "reckless disregard" for purposes of finding willfulness. *Id.* at 87.

In interpreting a variety of criminal statutes, other Circuits have reached the same conclusion: post-*Bryan* and *Safeco*, "reckless disregard" still can—and does—constitute criminal willfulness. *See, e.g.*, *United States v. Trudeau*, 812 F.3d 578, 588-89 (7th Cir. 2016) (concluding that because meaning of "willful" is "influenced by its context," *Safeco* did not bar defining willful in terms of reckless disregard); *United States v. Anderson*, 741 F.3d 938, 948 (9th Cir. 2013) (stating that "recklessness" is a "valid theor[y]" for establishing defendant "willfully" engaged in criminal copyright infringement); *United States v. George*, 386 F.3d 383, 392-96 (2d Cir. 2004) (Sotomayor, J.) (concluding, after lengthy survey of case law, that *Bryan* did not displace earlier Supreme Court case law holding criminal "willfullness" requires "only the minimum *mens rea* necessary to separate innocent from wrongful conduct" and therefore interpreting "willfully" requirement in criminal passport fraud statute as proscribing "false statements that are knowingly included in the passport application"); *United States v. Johnstone*, 107 F.3d 200, 208-09 (3d Cir. 1997) ("'[W]illful[ly]' in [federal criminal civil rights statute, 18 U.S.C. § 242,] means either particular purpose or reckless disregard."); *United States v. Rapone*, 131 F.3d 188, 195 (D.C. Cir. 1997) (defining "willful" for purposes of

19

criminal contempt as "deliberate or reckless disregard of the obligations created by a court order"); *cf. United States v. Kay*, 513 F.3d 432, 447-48 (5th Cir. 2007) (concluding, post-*Bryan*, that a "defendant's *knowledge* that he committed the act is sufficient" to constitute criminal willfulness (emphasis added)).

In sum, contrary to Defendant's position, *Bryan* and *Safeco* did not prohibit the use of "reckless disregard" in defining "willfully" for purposes of criminal statutes.

2.

Having determined that "reckless disregard" can constitute criminal "willfulness," we now must determine whether the district court properly concluded that "reckless disregard" amounts to willfulness for purposes of Section 820(d). In deciding this question, we do not write on a clean slate. In *United States v. Jones*, 735 F.2d 785 (4th Cir. 1984), we affirmed a trial court's instruction that a criminal defendant "willfully" violated a federal mine safety standard if he acted "either in intentional disobedience of the [safety] standard or in reckless disregard of its requirements." *Id.* at 789. "This language conforms to the interpretations of willfulness provided by several of the circuits," we held. *Id.* In reaching this conclusion, we relied on the Sixth Circuit's decision in *United States v. Consolidation Coal Co.*, 504 F.2d 1330 (6th Cir. 1974)—the only appellate decision interpreting the meaning of "willfully" in a criminal provision of a federal mine

20

safety statute—which held that an act or omission is "willful if done knowingly and purposefully by a coal mine operator who, having a free will or choice, either intentionally disobeys the standard or *recklessly disregards* its requirements." *Id.* at 1335 (emphasis added); *Jones*, 735 F.2d at 789.

Defendant contends that we should disregard *Jones* because, notwithstanding that the district court instructed the jury on the meaning of "willfully," *Jones* involved a prosecution under a provision in the Mine Safety Act with a "knowing," as opposed to "willful," *mens rea* requirement. But we see no reason to depart from *Jones*' statement that, for purposes of the Mine Safety Act's criminal provision, willfulness encompasses reckless disregard—nor does Defendant provide us with any.

Section 820(d) derives from a substantively identical provision in the federal Coal Mine Health and Safety Act of 1969 (the "Coal Act"), which the Mine Safety Act replaced. At the time Congress enacted the Mine Safety Act, the Sixth Circuit had already interpreted "willfully" in the Coal Act in terms of "reckless disregard." *Consol. Coal Co.*, 504 F.2d at 1335. Because "[w]e assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990), we must presume that Congress intended "willfully" in Section 820(d) to have the same meaning as the judicial construction of the term in the Coal Act, *see United States v. Georgopoulous*, 149 F.3d 169, 172 (2d Cir. 1998) (construing,

21

post-*Bryan*, "willfulness" element in labor union bribery statute as requiring only general intent because such a construction accorded with the judicial construction of willfulness in the statute from which the bribery provision derived). That Congress enacted the Mine Safety Act because it believed the penalties available under the Coal Act had proven insufficient to deter safety violations further evidences that Congress did not intend for courts to construe "willfully" in the Mine Safety Act more strictly than they had interpreted the term in the parallel provision in the Coal Act, as Defendant invites us to do here. *See* S. Rep. 95-181, at 4, 9 (1977) ("[E]nforcement sanctions under the [Coal Act] are insufficient to deal with chronic violators.").

Other Congressional statements in the legislative history of the Mine Safety Act further indicate that Congress intended to bring conduct evidencing reckless disregard within the meaning of "willfully." In particular, Congress imposed enhanced penalties in the Mine Safety Act because it found "[m]ine operators still find it cheaper to pay minimal civil penalties than to make the capital investments necessary to adequately abate unsafe or unhealthy conditions, and there is still no means by which the government can bring habitual and chronic violators of the law into compliance." S. Rep. 95-181, at 4. Accordingly, Congress saw criminal penalties as a mechanism to punish "habitual" and "chronic" violators that choose to pay fines rather than remedy safety violations.

22

As noted previously, we explained in *RSM* that an inference of plain indifference—and therefore willfulness—arises from evidence of "continu[ing]" or "increas[ing]" violations "in the face of repeated warnings given by enforcement officials." 466 F.3d at 322. Put differently, a "long history of repeated failures, warnings, and explanations of the significance of the failures, combined with knowledge of the legal obligations, readily amounts to willfulness." *Id.*

Other courts have reached the same conclusion. *See, e.g.*, *Screws*, 325 U.S. at 104-05 (plurality op.) (holding that reckless disregard amounted to criminal willfulness and stating that "contin[uing]" or "persist[ing]" in action that violates established law constituted willfulness under that definition); *United States v. Jeremiah*, 493 F.3d 1042, 1045-46 (9th Cir. 2007) ("[A] finding of willfulness was supported by [defendant's] repeated failure to make restitution payments on time."); *Rapone*, 131 F.3d at 195 (holding defendant's failure to heed "repeated warnings" of noncompliance provided basis for factfinder to conclude defendant acted "willfully"); *United States v. Garcia*, 762 F.2d 1222, 1225-26 (5th Cir. 1985) (finding that defendant's continued violation of particular provision in tax code in the face of "repeated" warnings from government officials constituted willfulness); *cf. Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 415 F.3d 1274, 1277 (11th Cir. 2005) ("[A defendant's] repeated violations after it

23

has been informed of the regulations and warned of violations does show purposeful disregard or plain indifference.").

That (1) Congress imposed enhanced penalties on mine operators in order to punish operators who "chronic[ally]" and "habitual[ly]" violate mine safety laws, rather than to devote resources to safety compliance, and that (2) courts construe willfulness in terms of reckless disregard when a statute is intended to levy criminal penalties on defendants who persist in violating a federal law notwithstanding repeated warnings of the violations, further indicates Congress intended to define "willfully" in Section 820(d) in terms of reckless disregard.

Finally, 30 U.S.C. § 820(d) parallels the criminal liability provision in the Gun Control Act at issue in *Bryan* and *RSM*, 18 U.S.C. § 924(d)(1). In particular, both Section 820(d) and Section 924(d)(1) prohibit the "willful violation" of the substantive provisions of their respective statutes and the regulations promulgated thereunder. Indeed, Defendant acknowledges that "[t]here is no textual basis for distinguishing the Mine Act's identically constructed liability provision from the statutory liability provision in *Bryan*." Appellant's Br. at 48. Additionally, the Mine Safety Act and Gun Control Act serve similar purposes by establishing complex federal regulatory regimes designed to protect public safety. In *RSM*, we held that plain indifference or reckless disregard amounts to criminal willfulness for purposes of Section 924(d)(1). 46 F.3d at 321-22 & n.1. Given the textual and functional

24

similarity between Section 924(d)(1) and Section 820(d), we likewise interpret "willfully" in Section 820(d) in terms of reckless disregard.

3.

Defendant and amici coal industry trade associations nonetheless maintain that, as a matter of policy, Congress did not intend for reckless disregard to amount to willfulness, as that term is used in Section 820(d), for four reasons: (1) Congress could not have intended to hold mine operators criminally liable for making "budgeting" and "business" decisions about how to allocate resources between production and safety compliance; (2) "violations inexorably result from coal production" and therefore violations should not give rise to criminal liability absent evidence a defendant committed such violations with specific intent to violate a particular mine safety statute or regulation; (3) defining willfully in terms of reckless disregard would allow juries to find mine operators criminally liable even when the operators did not want safety violations to occur; and (4) if "reckless disregard" amounts to willfulness, then operators will be deterred from engaging "in detailed oversight over important aspects of safety and regulatory compliance." *See* Appellant's Br. at 53-54; Amicus Brief of Illinois Coal Ass'n, Ohio Coal Ass'n and West Virginia Coal Ass'n ("Amicus Br.") at 24, 26. We disagree.

First, the legislative history of the Mine Safety Act contradicts Defendant's and amici's argument that Congress did not intend to punish mine operators for the

25

type of budgeting and business decisions the government challenged here. In particular, Congress repeatedly stated that the Mine Safety Act's enforcement provisions were designed to deter mine operators from choosing to prioritize production over safety compliance on grounds that it was "cheaper to pay the penalties than to strive for a violation-free mine." S. Rep. No. 95-181, at 9; *see also id.* at 4 (expressing concern that "[m]ine operators still find it cheaper to pay minimal civil penalties than to make the capital investments necessary to adequately abate unsafe or unhealthy conditions"). To that end, Congress said that operators should not balance the financial returns to increasing output against the costs of safety compliance. *See id.* at 9 ("The Committee strongly believes that industry-wide compliance with strong health and safety standards *must be a basic ground rule for increased production*." (emphasis added)).

Congress imposes penalties on corporate officers—like Defendant— alongside enterprise penalties because it is often impossible to impose monetary penalties on corporations large enough to deter corporate misconduct. John C. Coffee, *"No Soul to Damn: No Body to Kick": An Unscandalized Inquiry into the Problem of Corporate Punishment*, 79 Mich. L. Rev. 386, 390-91 (1980) ("[O]ur ability to deter the corporation may be confounded by our inability to set an adequate punishment cost which does not exceed the corporation's resources."). And when the returns to violating a law exceed a potential corporate fine, discounted by the

26

likelihood of the government imposing the fine, corporate officers who do not face personal liability will treat "criminal penalties as a 'license fee for the conduct of an illegitimate business'"—as the government's evidence showed Defendant did here. *See United States v. Park*, 421 U.S. 658, 669 (1975) (quoting *United States v. Dotterweich*, 320 U.S. 277, 282-83 (1943)).

By subjecting mine operators to personal liability, including incarceration, Congress forced mine operators to internalize the costs associated with noncompliance with mine safety laws, even when such noncompliance would be profit-maximizing from a business perspective. *See* Timothy P. Glynn, *Beyond "Unlimiting" Shareholder Liability: Vicarious Tort Liability for Corporate Officers*, 57 Vand. L. Rev. 329, 430-31 (2004) (explaining that subjecting corporate officers to personal liability forces such officers to internalize risk associated with corporation's non-compliance with laws). Put differently, in subjecting mine operators—who have "primary responsibility for providing a safe and healthful working environment," S. Rep. No. 95-181, at 18—to personal liability, Congress wanted to deter operators from choosing to treat penalties for violating safety provisions as a "license fee" to be factored into profit-maximization analyses, *Park*, 421 U.S. at 669. Accordingly, contrary to Defendant's and amici's position, a mine operator cannot immunize himself from criminal liability under Section 820(d) by characterizing his mine's repeated failure to comply with safety laws as a

consequence of "tough decisions" he had to make weighing "production, safety, and regulatory compliance." Amicus Br. at 26.

Second, regarding amici's contention that the "unavoidability" and "inexorability" of mine safety violations precludes use of such violations to establish criminal intent, we rejected an identical argument in *RSM*. There, the defendant—a firearms dealer—argued that its repeated failure to correctly fill out forms establishing that a customer was qualified to purchase a firearm did not amount to willfulness because, given the complexity of the regulatory regime and the number firearms the defendant sold, "human errors were virtually inevitable." 466 F.3d at 322. In rejecting defendant's argument, we explained that even though "inadvertent" violations may not amount to willfulness, continuing violations in "the face of repeated warnings" allows a jury to infer criminal intent. *Id.* We see no reason to diverge from that principle here, particularly in light of the parallels between Section 820(d) and Section 924(d)(1). *See supra* Part IV.A.2.

Next, Defendant argues that defining willfully in terms of reckless disregard impermissibly allowed the jury to convict him even if it concluded that Defendant desired "to eliminate and reduce the [safety] hazards and violations" at the Upper Big Branch mine. Appellant's Br. at 54. But just as the law holds criminally liable an individual who drives a car with brakes he knows are inoperable, even if he does not intend to harm anyone, *e.g.*, *State v. Conyers*, 506 N.W. 2d 442, 443-44 (Iowa

28

1993), so too Section 820(d) holds criminally liable a mine operator who fails to take actions necessary to remedy safety violations in the face of repeated warnings of such violations, regardless of whether the operator subjectively wanted the violations to continue.

Finally, contrary to amici's assertion, defining willfully in terms of reckless disregard should not deter mine operators from engaging in detailed safety oversight. The Mine Safety Act declares that "operators"—like Defendant—"have the *primary* responsibility to prevent . . . unsafe and unhealthful conditions and practices" at mines. 30 U.S.C. § 801 (emphasis added). And in *Jones*, we affirmed the trial court's instruction that "[r]eckless disregard means the closing of the eyes to or deliberate indifference toward the requirements of a mandatory safety standard, which standard the defendant should have known and had reason to know at the time of the violation." 735 F.2d at 790. Here, the district court correctly defined "reckless disregard" using the language we endorsed in *Jones*. J.A. 1556. Because mine operators have "primary" responsibility for safety and regulatory compliance and because an operator acts with reckless disregard if he "clos[es] [his] eyes" to safety compliance or "should have known" that an action or omission would lead to a safety violation, a mine operator cannot avoid liability under Section 820(d) by failing to engage in close oversight over safety and regulatory compliance.

29

In sum, the district court properly instructed the jury that it could conclude that Defendant "willfully" violated federal mine safety laws if it found that Defendant acted or failed to act with reckless disregard as to whether the action or omission would lead to a violation of mine safety laws.

B.

In addition to taking issue with the "reckless disregard" language in the fourth instruction, Defendant also suggests that the first, second, and third instructions improperly permitted the jury to convict Defendant even if he did not know that a particular act or omission would lead to a violation of mine safety laws and regulations. Again, we disagree.

The first instruction stated that a defendant willfully "fails to perform an act required by a mandatory safety or health standard if he knows that the act is not being performed and knowingly, purposefully, and voluntarily allows that omission to continue." J.A. 1556. Defendant maintains that this instruction "permits a finding of willfulness . . . even if a person does not know that 'the act' in question is required by safety regulations." Appellant's Br. at 46. But by using the definite article "the" to modify "act," the instruction required that the jury find that Defendant knew the act was "required by a mandatory safety or health standard." *Cf. Gale v. First Franklin Loan Svcs.*, 701 F.3d 1240, 1246 (9th Cir. 2012) ("In construing a statute,

30

the definite article 'the' particularizes the subject which it precedes and is a word of limitation." (alterations and quotations omitted)).

The second instruction described willfully as "knowingly, purposefully, and voluntarily tak[ing] actions that he knows will cause a standard to be violated." J.A. 1556. The third instruction stated that an operator acts willfully if he "knowingly, purposefully, and voluntarily fails to take actions that are necessary to comply with the mandatory mine safety or health standard." *Id.* Contrary to Defendant's argument, the use of "that" in each of these instructions required the jury to conclude that Defendant knew the action or omission would "cause a standard to be violated" or was "necessary to comply with the mine safety or health standard." *See* The Chicago Manual of Style § 5.220 (16th ed. 2010) (explaining that "that" is a "relative pronoun . . . used restrictively to narrow a category or identify a particular item being talked about").

Accordingly, all three instructions reflect the "bad purpose" *mens rea* discussed in *Bryan* because they required that the jury conclude that Defendant took actions that he knew would lead to violations of safety laws or failed to take actions that he knew were necessary to comply with federal mine safety laws—i.e., Defendant knew that his actions and omissions would lead to violations of mine safety laws and regulations.

31

V.

Finally, Defendant asserts that the district court reversibly erred in providing the so-called "two-inference" instruction, pursuant to which it instructed the jury that if it "view[ed] the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury should, of course, adopt the conclusion of innocence." J.A. 1552. Defendant asserts that the two-inference instruction impermissibly reduced the government's burden of proof.

As explained previously, we review de novo whether a jury instruction correctly stated applicable law, assessing "whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Jefferson*, 674 F.3d at 351 (quotation omitted); *see also United States v. Khan*, 821 F.2d 90, 92 (2d Cir. 1987) (determining whether use of "two-inference" instruction constituted reversible error by assessing whether "the court's charge, taken as a whole, properly instructed the jury on reasonable doubt").

Although this Court has not had an opportunity to pass judgment on the two-inference instruction, our Sister Circuits disfavor it. *See, e.g.*, *United States v. Dowlin*, 408 F.3d 647, 666 (10th Cir. 2005); *United States v. Jacobs*, 44 F.3d 1219, 1226 (3d Cir. 1995); *Khan*, 821 F.2d at 93. In *Khan*, the Second Circuit explained that, although correct as a matter of law, the two-inference instruction "by implication suggests that a preponderance of the evidence standard is relevant, when

32

it is not. . . . It instructs the jury on how to decide when the evidence of guilt or innocence is evenly balanced, but says nothing on how to decide when the inference of guilt is stronger than the inference of innocence but no[t] strong enough to be beyond a reasonable doubt." 821 F.2d at 93. We agree and therefore direct our district courts not to use the two-inference instruction going forward.

Although we disapprove of the two-inference instruction, the district court's use of that instruction here does not amount to reversible error because, when viewed as a whole, the court's instructions correctly stated the government's burden. In particular, the court instructed the jury several dozen times that it needed to find Defendant guilty beyond a reasonable doubt, including immediately before and after it used the two-inference instruction. Likewise, the court correctly instructed the jury regarding the presumption of innocence and the government's burden. Accordingly, the district court did not reversibly err in providing the two-inference instruction. *See, e.g.*, *United States v. Soto*, 799 F.3d 68, 96-97 (1st Cir. 2015) (rejecting challenge to "two-inference" instruction under "any standard of review" because "there was no 'reasonable likelihood' that the jury misunderstood the government's burden"); *Dowlin*, 408 F.3d at 666-67 ("The instructions as a whole told the jury not to convict [the defendant] unless the government proved his guilt beyond a reasonable doubt."); *United States v. Creech*, 408 F.3d 264, 268 (5th Cir. 2005) (finding no reversible error in use of two-inference instruction when district

33

court repeatedly informed the jury of the presumption of innocence, the "heavy burden borne by the government," and that the law does not require the defendant to prove his innocence); *Khan*, 821 F.2d at 92 (finding use of two-inference instruction not reversible error because "[t]he judge instructed the jury several times on the meaning of reasonable doubt and specifically told the jury to acquit unless it was 'satisfied beyond a reasonable doubt of the defendant's guilt'").

## VI.

For the foregoing reasons, we affirm the District Court's judgment.

AFFIRMED