IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 31, 2018 Session

**CHARLES STEPHEN PERRY, ET AL. v. WINFIELD SCOTT NILES, ET AL.**

**Appeal from the Chancery Court for Greene County**
**Nos. 20150231, 20150221, 20150042     Douglas T. Jenkins, Chancellor**

_____

**No. E2017-01891-COA-R3-CV**

_____

Winfield Scott Niles ("Niles") and Nancy Niles[1] appeal the judgment of the Chancery Court for Greene County ("the Trial Court") in this suit involving disputes regarding easements across real property owned by Niles located in Greene County, Tennessee. Niles raises issues regarding the Trial Court's findings regarding the width and the permitted uses of the easements and the Trial Court's finding that Niles was in contempt of court. We find and hold that the Trial Court did not err in determining the width and permitted uses of the easements. We further find and hold that the Trial Court did not err in finding Niles in contempt of court. Finding no error, we affirm the Trial Court's February 28, 2017 Judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and JOHN W. MCCLARTY, JJ., joined.

Jeffrey A. Cobble, Greeneville, Tennessee, for the appellants, Winfield Scott Niles and Nancy Niles.

---

[1] In the Answer to Second Amended Complaint, Niles asserted that Nancy Niles is not an owner of the real property at issue. A review of the record on appeal reveals that Winfield Scott Niles purchased his property from Tony Hagwood, and that Nancy Niles is not named in that deed. Despite this, Nancy Niles is a named party to the suit and is a named appellant. To the extent that Nancy Niles has an interest in this case, her interest is identical to that of her husband, Winfield Scott Niles. For ease of reading only, in this Opinion in the appropriate places when we refer to 'Niles' we are referring both to Winfield Scott Niles and to Nancy Niles collectively with the understanding that Winfield Scott Niles testified at trial and Nancy Niles did not and that Winfield Scott Niles was found to be in contempt of court, but Nancy Niles was not.

Jerry W. Laughlin, Greeneville, Tennessee, for the appellees, Charles Stephen Perry, Charles A. Montgomery, and 612 Trust Under Amendment and Restated Declaration of Trust Dated May 21, 2014.

## OPINION

## Background

Since purchasing real property adjacent to property currently owned by Niles in March of 2000, Charles A. Montgomery ("Montgomery") and his family have used an easement ("Easement 1")[2] across the Niles property as the only means of access to the Montgomery property. Easement 1 adjoins Whirlwind Road and is an express written easement created in the 1996 deed from Tony Hagwood and Joy Hagwood to J.C. Dollar and Carolyn Dollar. In pertinent part, this deed provides:

> THERE IS FURTHER CONVEYED HEREBY an easement, for residential purposes only for the benefit of J.C. Dollar and wife, and for their successors, assigns and invitees, the right to access the 9.15 acre property over an existing private road which extends from the Clyde Austin Road, over property of Austin and the remaining property of Hagwood, which said right of way shall be permanent.

The right to use Easement 1 passed to Montgomery when he and his wife purchased their real property from the Dollars in March of 2000.

Charles Stephen Perry ("Perry") and his wife purchased real property adjoining the Niles property from Tony Hagwood in May of 2003. In conjunction with the sale and purchase of the Perry property, Perry and Tony Hagwood entered into a written Easement Agreement providing Perry with the right to use Easement 1 and the right to create another easement across the Niles property ("Easement 2"), which would connect Easement 1 with the Perry property. Without Easement 2, Easement 1 does not lead to the Perry property, making Easement 1 alone useless to Perry. This Easement Agreement provides:

---

[2] A portion of Easement 1 is sometimes referred to within the record on appeal as Clyde Austin Road. Issues were raised at the trial level with regard to whether Easement 1 actually was Clyde Austin Road, or whether the name Clyde Austin Road referred to another road. As no issues were raised on appeal with regard to the location of Clyde Austin Road, we need not discuss in this Opinion either the location of Clyde Austin Road or whether Easement 1 is properly referred to as Clyde Austin Road. We take this opportunity to mention that Easement 1 is sometimes referred to as Clyde Austin Road merely to assist readers in understanding the facts presented in this Opinion.

2

WHEREAS, Tony D. Hagwood has entered into an agreement to sell to Charles Stephen Perry and wife, Marie S. Perry, five (5) parcels of real estate situated in the 9th Civil District of Greene County, Tennessee, which consists of a 3.44 house tract, a 5.71 acre tract, a 0.08 acre parcel, a 1.39 acre tract and a 0.49 acre tract as evidenced by a warranty deed of even date herewith;

WHEREAS, following the execution of the deed, Hagwood shall retain approximately 23 acres of real estate upon which is situated a road which provides a means of access into the remaining property of Hagwood and also provides a means of access into approximately 16 acres owned by Dr. Charles Montgomery and wife;

WHEREAS, the private road is presently used as a means of access into the properties of Hagwood and Montgomery by Hagwood and the Montgomery's [sic] and their invitees;

WHEREAS, Hagwood has further agreed to grant unto the Perrys an easement over a portion of the said road, and an additional easement over certain other remaining property of Hagwood, to provide the Perrys an additional means of access to the property which they have purchased from Hagwood; and

WHEREAS, Hagwood and the Perrys which [sic] to reduce the agreement to writing;

**1. Grant of Easement Over Existing Road.** Hagwood does hereby grant unto the Perrys a non-exclusive personal easement, to be shared between Hagwood, the Montgomerys, and the Perrys, and their successors in title, over the existing road from the point where same leaves the Whirlwind Road, proceeds in a northwesterly direction for approximately 500 feet, and then turns in a southwesterly direction, and extends into and through the remaining 23 acres of Hagwood to a point where same is within 50 feet of an existing pond to the south of the said existing road. The grant of this non-exclusive personal easement shall be conditioned upon the duty of Hagwood, the Montgomerys, and the Perrys, and their heirs, successors and assigns, to share the cost and duty of maintaining same, provided that the Perrys [sic] share of the cost of the maintenance of same shall be 25%. The width of the easement granted hereby shall be the width of the existing road bed along the road described in this paragraph.

3

**2. Grant of Second Easement.** Hagwood does further grant to the Perrys an additional personal easement, 15 feet in width, the location of which is generally described as follows:

> BEGINNING at a point in the southern edge of the existing private road described in the foregoing paragraph, which said point is 50 feet from the northeastern edge of an existing pond, and running thence in a southerly direction for approximately 240 feet to a point where same enters into the property this day purchased by the Perrys from Hagwood.

The parties mutually acknowledge that there is no existing road upon the site of the location of the second easement. The parties mutually agree that in the event the Perrys wish to exercise the second easement granted hereby as a means of additional ingress and egress, that they shall cause to be constructed a road, not wider than 15 feet, at their sole cost, and shall be solely responsible for the cost of maintaining same.

**3. Exclusivity of Easement.** The grant of both of these easements shall be for the sole and and [sic] exclusive use of the Perrys and their immediate family members and their guests, but shall not be assignable or transferable to any third party without the written consent of Hagwood.

**4. Relocation of Easement.** No term herein shall preclude the parties hereto from relocating the second easement or from changing the length of the first easement by mutual agreement.

**5. Binding Effect.** The terms and conditions of this Easement Agreement shall be binding upon the parties hereto and their heirs, successors and assigns.

Niles purchased the real property upon which the two easements sit from Tony Hagwood in March of 2005. The deed to Niles provided, in pertinent part:

THERE IS EXCEPTED from the foregoing described premises an existing right of way or easement for the Clyde Austin Road, a public road, which crosses a portion thereof.

4

In early 2014, Perry decided to exercise his right to create Easement 2 and constructed a road linking Easement 1 to the Perry property. Perry then began using Easement 1 and Easement 2 to access his property.

In September of 2014, a parcel of real property adjoining the Niles property was deeded to the Trustees of the 612 Trust under the Amended and Restated Declaration of Trust for 612 Trust Agreement, dated May 21, 2014 ("612 Trust"). Perry is one of the trustees of the 612 Trust. The 612 Trust also has used Easement 1 to access its property.

In 2015, Niles placed T-posts, which blocked the use of Easement 1. Montgomery then filed suit against Niles. Perry filed a separate suit against Niles, and the 612 Trust filed a third suit against Niles. The cases were consolidated and proceeded to trial without a jury.

Montgomery testified at trial that he resides on Whirlwind Road which is a paved road in Greeneville, Tennessee. Montgomery explained it is a little over three tenths of a mile from the Montgomery property line to Whirlwind Road. Montgomery acquired his property in March of 2000 from the Dollars who had purchased the property from the Hagwoods. At the time that Montgomery purchased his property, Tony Hagwood owned other property located between the Montgomery residence and Montgomery's mailbox on Whirlwind Road. Niles now owns this other property.

Montgomery testified that his deed conveyed to him a right to use Easement 1 for residential purposes. Part of Easement 1 consists of gravel. Montgomery testified that at different times he has put gravel on Easement 1, Perry has put gravel on Easement 1, and Perry's son-in-law and daughter have put gravel on Easement 1. Montgomery explained that they have not put gravel on the entire width of Easement 1 because it would cost too much. Montgomery has had the gravel graded at times.

Montgomery testified that there is no other road to the Montgomery residence and that when he first began residing on his property, the Hagwoods also used Easement 1. Montgomery explained that the Hagwoods built another residence that connects with Easement 1, and this is the residence where Niles now lives. Niles purchased his land from Hagwood in March of 2005.

During the five years before Niles purchased his property, Montgomery and his wife traveled from their residence to Whirlwind Road on a daily basis using Easement 1. They sometimes traveled Easement 1 two or three times a day. Montgomery testified that occasionally he would meet another vehicle traveling in the opposition direction. Montgomery testified that when this happened, the vehicles never had to back up but would pull off to the side of Easement 1 to allow the vehicles to pass one another.

Montgomery stated: "We never looked at the graveled part as being the entire easement. There was never any obstructions there that we would run into or hit or anything." Until 2015, no one ever had placed an obstacle or barrier along Easement 1. Montgomery testified that during the first ten years that Niles owned his property, the parties continued the pattern of pulling to one side to pass one another on Easement 1 when necessary and never had to back up.

Montgomery filed suit in 2015 after Niles placed T-posts in the road that effectively blocked Easement 1. Montgomery explained that he had a friend who was coming to cut his hay, and the friend was unable to get his trailer in through Easement 1 without moving some T-posts. Montgomery's friend moved some of the T-posts and laid them on the ground, and then Montgomery spoke to Niles. After speaking with Niles, Montgomery decided to file suit. Montgomery testified that T-posts were placed at two different times in two different locations. The first time, T-posts were placed "[w]here Clyde Austin Road comes into the private road" and the second time where Perry's Easement 2 joins Easement 1.

Montgomery testified that he and his household use Easement 1, Perry and his household use Easement 1, and Niles and his household use Easement 1. Montgomery agreed that because all three households use Easement 1, it is becoming more common to meet vehicles traveling in the opposite direction on Easement 1.

Montgomery was asked how wide Easement 1 was treated as being during the first five years he owned his property, which was prior to Niles purchasing his property. Montgomery stated: "Well, I looked at it as the gravel part of the easement. We went off to the right of the easement. We went off to the left of the gravel part of the easement. I would say, and that's what I told you, twenty-five feet." Montgomery testified that until Niles put up the T-posts, no one obstructed Easement 1 to anything less than twenty-five feet. Montgomery agreed that a survey showed the width of the graveled portion of Easement 1 to be ten to eleven feet wide until the easement turns and then between eleven and fourteen feet wide.

When Montgomery filed suit, he asked for Easement 1 to be declared to be twenty feet wide. By the time of trial, Montgomery was asking for a declaration that Easement 1 was twenty-five feet wide. Montgomery stated that he changed his request because he discovered that twenty feet would not be wide enough for two emergency vehicles to pass one another on Easement 1. Montgomery agreed that what he was asking for would more than double the width of the gravel road as it currently exists. He stated: "But I feel like that's the way we've used it. We've always used it going off to the right side or we've used it going off to the left side. Not just the gravel portion of the road." Montgomery admitted that there is a culvert on Easement 1 that limits the width of the travel lane at

6

that point and that two vehicles could not pass one another at the culvert. There is one other culvert along Easement 1, and Montgomery testified that he thought that this other culvert was about ten or twelve feet wide.

Melvin Seaton, Chief of the Sunny Side Volunteer Fire Department and Secretary of the Greene County Association of Fire Departments, testified that there is no fire hydrant at Montgomery's residence. If a fire broke out at the Montgomery residence, the firefighters would have to shuttle water in by truck. Seaton testified that if there were a substantial fire, they would probably need at least four tanker trucks. He testified that the width of a tanker truck is nine feet two inches, and the width of a pumper truck, which would be first on the scene of a fire, is ten feet. When asked, Seaton admitted that there are some county roads that are not wide enough for two fire trucks to pass in opposite directions. He stated that there are times when firefighters have had to go across fields to fight fires and that they do what they need to do to fight a fire even if that involves trespassing.

Perry testified at trial that he purchased his property in 2003 from Tony Hagwood. At that time, Hagwood owned adjoining property. Perry explained that he negotiated Easement 2 with Hagwood to accommodate future anticipated construction on Perry's property and to allow for tour busses used by Perry's adult children in their business to access the back of the Perry property.

Perry chose to exercise his right to create Easement 2 in the spring of 2014, in preparation for his daughter's upcoming wedding, which was held in June of 2014. Perry had a surveyor locate the beginning point for Easement 2. Perry was asked about the width he and Hagwood had negotiated for Easement 2, and he stated: "the width of easement 1 in 2003 appeared to be adequate and since it was already established we felt it was adequate to allow the type of traffic that we anticipated using it for."

Perry testified that when Hagwood owned the property now owned by Niles, there were no obstacles or barriers that would interfere with the use of Easement 1. Niles placed T-posts that interfered with both Perry's use of Easement 1 and the 612 Trust's use of Easement 1. Perry stated that because of the T-posts, he could not negotiate the curve in his pickup truck. Perry also testified that John Deere, who was mowing the 612 Trust property and using it as a test facility, was unable to bring in vehicles with mowers. Perry testified that there are improvements on the 612 Trust property and that emergency vehicles would be unable to reach the property with the T-posts in place.

Niles also parked a pickup truck to block Perry's access to Easement 2. Perry moved for a temporary injunction, and the Trial Court entered a Temporary Injunction on March 9, 2015 enjoining and restraining Niles from obstructing Easement 2 until trial "in

7

order to preserve the status quo . . . ." Perry testified that after entry of the Temporary Injunction Niles again placed T-posts that interfered with Perry's ability to travel from Easement 1 on to Easement 2.

Perry testified that he believes Easement 1 is wider than the gravel bed. He believes that the gradings of the gravel on Easement 1 have narrowed the width of Easement 1 over the years. Perry stated that the width of Easement 1 should be at least as wide as the stated width of Easement 2.

When asked, Perry agreed that since opening Easement 2, he has used both Easement 1 and Easement 2 fairly regularly for heavy equipment, for construction equipment, and for bringing in rock, dirt, and other things. Perry admitted that during the last two years and since the filing of the lawsuit, there have been dozens and dozens of trips over the easements made by heavy equipment traveling to the back of the Perry property.

There is a gate between the Niles property and the 612 Trust property that sits on the 612 Trust side of the property line. This gate was installed before the 612 Trust purchased the property in 2014. Perry stated that the gate sits four or five feet inside the boundary line of the 612 Trust property. The gate, however, swings on to the Niles property. When asked, Perry agreed that the property slopes upward at the gate.

Daniel Coffey ("Coffey"), registered land surveyor and professional engineer, testified that he performed work for Niles and prepared sketches. Coffey was asked to look at Clyde Austin Road and measure the width of the gravel from the outside edge of the right to the outside edge of the left every ten feet. Coffey testified that he did not prepare a survey, but that his sketches bear his seal. Coffey stated:

> I believe we show that out on Whirlwind Road in the right of way it's twenty-four feet, but it's in a, it's in a fill, there's a fill, typically is when you have an intersection vehicles have to swing out wider, so it, it goes from seventeen feet down to twelve and then it runs between ten and eleven feet pretty much until it gets back to the curvature. It goes up to a little bit wider in spots. . . . There's thirteen to fourteen feet along in this area and, and then the drive going on this way is, is ten to twelve feet wide. The one going on to the, to the northwest onto the 612 property is twelve, fourteen, ten. It, it varies, but that was the existence of the gravel as we fill located it this past March.

The widest measurement was twenty-six feet at the Y, where the road forks and goes either to the 612 Trust property or to the Niles and Montgomery residences. Coffey did

not visit the property, but sent his field crew to obtain the information. Coffey stated that they only measured the part of the easement past the Y for thirty or forty feet because they were not asked to measure any further. Coffey stated that in that 30 or 40 feet the largest width was 12.5 feet, and then it narrowed down to 10.9 feet.

Niles testified at trial that "historically this width of the so-called Clyde Austin section of the driveway has been the same as the rest of the driveway that services my property and Dr. Montgomery." Niles testified that the Montgomery easement is more narrow than the gravel drive from Whirlwind Road. Niles testified that he measured Easement 1 south of Perry's Easement 2, and stated that the road is between eight and nine feet wide. He stated that the only place where it exceeds that width is a little section right before the culvert and that the width of the culvert is approximately eleven or twelve feet. Niles stated that, in his opinion, the use of Easement 1 has never indicated that it is twenty-five feet wide. Niles testified that the width of Easement 1 prior to the increased traffic after Perry began construction on Easement 2 was "[e]ight feet, eight and a half, nine feet," and after the increased traffic has increased to "13 feet where it's expanded from the traffic."

Niles testified that from the time he purchased his property in 2005, until 2014, Niles experienced no problems with Montgomery. Niles explained that the working arrangement when one met a vehicle traveling in the opposite direction required that "[i]n some locations you have to back up because you couldn't do the culvert." Niles testified that the problems that led to the lawsuits were precipitated by "[t]he Perry easement and 612 and the Clyde, so-called Clyde Austin Road." With regard to Easement 1, Niles testified:

> My layman's understanding is that deeds refer to existing road. Existing road is gravel surface plus a little extra whatever, and we're talking about eight and half to twelve, thirteen feet total across, I'm not asking, that's what it is in my estimation.

Niles admitted that he placed the T-posts to prevent trespassing, but stated that he has no intention of fencing "along the rest of the driveway or Dr. Montgomery's easement or whatever."

Niles admitted that he was aware of the injunction entered by the Trial Court, and as a result he removed the first T-posts he had placed. Niles then admitted that after the Trial Court entered the injunction and told him not to block Easement 2, he put up T-posts where Easement 2 is located. He stated: "Because I viewed the trespass by Perry as a violation of the status quo. In other words, they were trespassing. They were going beyond the deeded measurements, the 15 and whatever the driveway was. . . . I just

marked off my line. I gave an extra couple of feet just so that they could understand the . . . ." When questioned further, Niles again admitted that he did place the T-posts after entry of the injunction. He was asked if he had placed the T-posts so that people couldn't get vehicles on to Easement 2, and he stated: "I very carefully put the T-posts at the outer side of the gravel area. The result was they couldn't get in because they were trespassing."

After trial, the Trial Court entered its Judgment on February 28, 2017 finding and holding, *inter alia*:

> **2**. as it pertains to the contested scope and use of that easement which is referenced in Tract I of that instrument which is found of record at **Deed Book 178A, page 260, Charles A. Montgomery and wife, Carrie L. Montgomery**, shall have an open and unobstructed residential and agricultural easement appurtenant, being fifteen (15) feet in width (and with wider turning aprons at the appropriate places), the center of which shall be the center of the existing gravel roadway on the Niles' property as shown on the survey plats introduced as exhibits, starting at the boundary line of Montgomery's 9.15-acre tract and running thence over the Niles' property to the edge of Whirlwind Road for the purposes of ingress and egress to the Montgomery's property, and Niles shall not in any way obstruct or otherwise interfere with Montgomery's use thereof.
> **3**. as it pertains to the contested scope and use of the two easements which are referenced in the "Easement Agreement found of record at **Deed Book 326A, page 652,**:
> (a) **Charles Stephen Perry and wife, Marie S. Perry**, shall have an open and unobstructed easement fifteen (15) feet in width (and with wider turning aprons at the appropriate places), the center of which shall be the center of the existing gravel roadway on the property of Niles as shown on the survey plats introduced as exhibits;
> (b) the location of the Perry Easement No. 2, as described in the recorded Easement Agreement, shall be deemed abandoned, and the current location upon which the Perrys have constructed a similar easement shall be declared to be the new location of Easement No. 2;
> (c) the Perry easement shall extend from the new location of Easement No. 2 and shall extend to Whirlwind Road;
> (d) the Perry easement shall be for single-family residential and noncommercial agricultural ingress and egress to the Perry's property, and Niles shall not in any way obstruct or otherwise interfere with the Perry's use thereof; and

10

(e) Except as otherwise explicitly modified in this Order, the express terms and limitations of the said Easement Agreement are still in effect and binding upon all parties.

**4**. **"612 Trust Under Amended and Restated Declaration of Trust dated May 21, 2014,"** shall have an open and unobstructed easement fifteen (15) feet in width (and with wider turning aprons at the appropriate places), the center of which shall be an existing gravel roadway on the Niles' property and as shown on the survey plats introduced as exhibits, extending from the boundary of the 612 Trust property and running over the Niles' property to Whirlwind Road, for the purpose of single-family residential and non-commercial agricultural ingress and egress to the 612 Trust's property, and Niles shall not in any way obstruct or otherwise interfere with the 612 Trust's use thereof.

\* \* \*

**6**. all easements described above shall be used only for single-family residential and non-commercial agricultural easements, but that said use will permit occasional utility vehicles and temporary construction vehicles.

**7.** any party may mow, maintain and do things to keep up the roadway within the aforesaid easement in order to keep it looking good and passable and keep their right to use and enjoy it intact, and all other parties be and are hereby enjoined from preventing them from doing so.

\* \* \*

**11**. by reason of conduct of Niles, for which the Court has found him to be in willful contempt of a previous Order of the Court to maintain the status quo, he shall pay to Plaintiffs the sum of $1,000.00, as partial reimbursement for some of the attorney's fees incurred on behalf of the Plaintiffs by reason of the additional work that he did because of that conduct.

Niles appeals to this Court.

### Discussion

Although not stated exactly as such, Niles raises six issues on appeal: 1) whether the Trial Court erred in finding that the width of Easement 1 was 15 feet; 2) whether the Trial Court erred in defining the term 'guests' as that term appears in the Easement Agreement; 3) whether the Trial Court erred in finding that Montgomery may use

Easement 1 for agricultural purposes in addition to residential purposes; 4) whether the Trial Court erred in finding that the 612 Trust could use their easement for residential and agricultural uses; 5) whether the Trial Court erred in failing to specify whether more than one single-family dwelling could be constructed on the 612 Trust property; and, 6) whether the Trial Court erred in finding that Niles was in contempt of court. Montgomery raises a separate issue, which we restate as whether the Trial Court erred in failing to declare the width of Easement 1 to be at least 18 feet.

Our review is de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly,* 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Kelly v. Kelly*, 445 S.W.3d at 692.

We first address the issue raised by Niles regarding whether the Trial Court erred in finding that the width of Easement 1 was 15 feet. In addressing this first issue, we also address the issue raised by Montgomery of whether the Trial Court erred in failing to declare the width of Easement 1 to be at least 18 feet.

In *Shew v. Bawgus*, this Court addressed an issue regarding the width of an easement granted by deed and explained:

> As our Supreme Court explained in *Griffis v. Davidson County Metro. Gov't*:
>
>> In construing a deed, our primary task is to ascertain the grantor's intent from the words of the deed as a whole and from the surrounding circumstances. *Collins v. Smithson*, 585 S.W.2d 598, 603 (Tenn. 1979); *Bennett v. Langham*, 214 Tenn. 674, 383 S.W.2d 16, 18 (1964). Interpretation of a deed is a question of law. *Rodgers v. Burnett*, 108 Tenn. 173, 65 S.W. 408, 411 (1901); *Mitchell v. Chance*, 149 S.W.3d 40, 45 (Tenn. Ct. App. 2004).
>
> *Griffis v. Davidson County Metro. Gov't*, 164 S.W.3d 267, 274 (Tenn. 2005). "In construing the language in a written instrument, 'the words expressing the party's intention should be given the usual, natural and ordinary meaning.' " *Cellco P'ship d/b/a Verizon Wireless v. Shelby County*, 172 S.W.3d 574, 587 (Tenn. Ct. App. 2005) (quoting *Ballard v. N. Am. Life & Cas. Co.*, 667 S.W.2d 79, 82 (Tenn. Ct. App. 1983)). "Any reference to subsequently executed instruments in order to glean the

grantor's intent at the time of conveyancing was in error." *Id.* at 590 (discussing the requirements for establishment of an easement by implication.).

In *Cellco P'ship d/b/a Verizon Wireless*, this Court stated:

"[t]he range of permissible uses of any particular easement is in the first instance defined by the circumstances surrounding the creation of that easement; its use is limited to the purposes for which it was created." 28A C.J.S. *Easements* § 159 (1996). Our case law adopts this general proposition, providing that:

"The use of an easement must be confined strictly to the purposes for which it was granted or reserved. A principle which underlies the use of all easements is that the owner of an easement cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden." 17 Am. Jur. 996, sec. 98 . . . .

"In other words, an easement appurtenant to a dominant tenement can be used only for the purposes of that tenement; it is not a personal right, and cannot be used, even by the dominant owner, for any purpose unconnected with the enjoyment of his estate. The purpose of this rule is to prevent an increase of the burden upon the servient estate, and it applies whether the easement is created by grant, reservation, prescription, or implication." 9 R.C.L., 786, sec. 43; Jones on Easements, secs. 99 and 100.

"A principle which underlies the use of all easements is that the owner thereof cannot materially increase the burden of it upon the servient estate, nor impose a new and additional burden thereon. . . . It may be said in general that if an easement is put to any use inconsistent

with the purpose for which it was granted, the grantee becomes a trespasser to the extent of the unauthorized use." 9 R.C.L., 790, sec. 47; Jones on Easements, secs. 99 and 100.

*Adams v. Winnett*, 25 Tenn. App. 276, 156 S.W.2d 353, 357 (1941); *see also McCammon v. Meredith*, 830 S.W.2d 577, 580 (Tenn. Ct. App. 1991).

*Cellco P'ship d/b/a Verizon Wireless*, 172 S.W.3d at 595–96. " 'Where [an] easement is not specifically defined, it need be only such as is reasonably necessary and convenient for the purpose for which it was created.' " *Burchfiel v. Gatlinburg Airport Auth., Inc.*, No. E2005–02023–COA–R3–CV, 2006 Tenn. App. LEXIS 747, at *9, 2006 WL 3421282, at *3 (Tenn. Ct. App. Nov .28, 2006), *no appl. perm. appeal filed*, (quoting *Adams v. Winnett*, 25 Tenn. App. 276, 156 S.W.2d 353, 358 (Tenn. Ct. App. 1941)).

In *Fanning v. Wallen*, this Court explained:

If the location of an easement cannot be ascertained by the language of the instrument or the surrounding circumstances, the use of the way fixes the location. *See Hill v. U.S. Life Title Ins. Co. of N.Y.*, 731 S.W.2d 910, 913 (Tenn. Ct. App. 1986) ("If a right of way is decreed over the lands of another, it is not necessary for the parties expressly to designate its location, but it is sufficient if a right-of-way is used and acquiesced in. The use fixes the location.") (quoting *Richardson v. Bristol Land & Improvement Co.*, 1 Tenn. App. 671, 690 (1929)).

*Fanning v. Wallen*, No. E2001–00228–COA–R3–CV, 2001 Tenn. App. LEXIS 620, at *15, 2001 WL 950001, at *6 (Tenn. Ct. App. Aug. 21, 2001), *no appl. perm. appeal filed*.

*Shew v. Bawgus*, 227 S.W.3d 569, 576-77 (Tenn. Ct. App. 2007).

As is the situation with Easement 1 in the case now before us, the easement at issue in *Shew* was created by deed, but the deed did not provide a width for the easement. *Shew*, 227 S.W.3d at 577. Also, as is similar to the situation in the case now before us, the easement at issue in *Shew* had been used as a driveway for years. *Id*. The holders of

the dominant estate in *Shew* sought to have the easement declared to be 30 feet in width, which would have increased the width of the area that had been in use for many years. *Id*. at 572. The *Shew* plaintiffs based their argument, in part, upon proof presented at trial that a width of 30 feet was necessary to accommodate fire-fighting apparatus. *Id*. at 573. In the case now before us on appeal, the plaintiffs made a similar argument at trial. In *Shew*, this Court held that to increase the width of the easement at issue to 30 feet would materially increase the burden upon the servient estate and cause an undue burden. *Id*. at 578. We stated: "As the Driveway has been used pursuant to the purpose for which it was created and its width has not changed in over fifty years, 'the use of the way fixes the location.'" *Id*. at 577 (quoting *Fanning v. Wallen*, No. E2001-00228-COA-R3-CV, 2001 WL 950001, at \*6 (Tenn. Ct. App. Aug. 21, 2001), *no appl. perm. appeal filed*).

In its memorandum opinion incorporated into the judgment by reference, with regard to this issue the Trial Court specifically found and held:

> The proof shows in the opinion of the Court that the road that we've been referring to as Clyde Austin Road is a private right-of-way, that it provides ingress and egress to and from Whirlwind Road to both the trust property and also the Perry and Montgomery property as those roads are shown on the survey plats that are the numerous exhibits. The one that comes to mind specifically is Exhibit Number 9, but it would be all the maps that are consistent with Map Number 9, they show the road, the road is a private right-of-way. I find that the road from the terminus of Whirlwind Road all the way to where that same road strikes the, the property boundary of the trust property and then the other fork which follows through and strikes the boundary of the Montgomery property is fifteen (15) feet in width. The reason the Court is deciding that width is because there's one exhibit, I think it's Exhibit Number 11, there's two pylons set out on the edge of the gravel and Mr. Niles, I think, testified that they were thirteen feet apart. But the Court believes that that entire roadbed, the flat place is considered the roadbed and it appears to me to be another two feet, arguably four, but I'm deciding it's two, and I'm saying that the road is fifteen feet in width at all places that are at issue in this case.
>
> Of course, there's also this private driveway that's at issue that runs from what we've been calling the Clyde Austin Road all the way up to the Montgomery property boundary. The Court finds the deed references are replete, it's a right-of-way. No question about it. The width is fifteen feet as I've already said. It was created and has always been used as an open and unobstructed right-of-way. The Court finds that it should remain open,

15

it should remain unobstructed and there should be no interference with the use of it from anybody against anybody else involved in this case.

\* \* \*

The Court finds that as an appurtenance to these specifically granted right-of-ways, commonsensically, what we have to know and look at is that if there's a place in that right-of-way where a turn is required, then there would be a little turning apron or something like that that might exceed the fifteen foot width, specifically where they're coming in or out with a trailer. If you, if you go home tonight and you drove posts right down the road fifteen feet where it T-d right into Whirlwind Road, I, I don't think that would be right. I think you would need to give them room, I hope you don't drive posts, but you need to give them room to swing in with a trailer or swing in with a vehicle that's a little longer than normal; I think I heard something about buses or something like that, but it's just a, it's just a common sense thing. It, it just -- if you -- if somebody's got a road across your property then they're going to have to turn in off the public road or they might have to make a turn out there where he goes in his gate, and when he makes that turn there's necessarily going to be a bit of a curve or, I call it a turning apron, whatever you want to call it, but if you have the center line on this thing surveyed and you do any further markings, have your surveyors take into account a turning apron at the appropriate places 'cause I think that goes along with the grant of a right-of-way.

In their respective briefs on appeal both appellants and appellees argue that the evidence preponderates against the Trial Court's finding that the width of Easement 1 is 15 feet. Niles argues that this finding increases the width of Easement 1, which he contends should be confined to the dimensions of the graveled section of Easement 1. Montgomery, in his brief on appeal, argues that Easement 1 has always been treated as being wide enough for two vehicles traveling in opposite directions to pass one another and that the Trial Court's finding of 15 feet in width is not sufficient to allow two vehicles to pass one another. Thus, both Niles and Montgomery assert that the evidence preponderates against the Trial Court's finding. We disagree with both.

The evidence in the record on appeal shows that the deed that created Easement 1 stated that this easement was over an "existing private road." The evidence further shows that this existing road is graveled and has historically been used for ingress and egress by Niles, Montgomery, the 612 Trust, and their respective predecessors in title, and that since Perry constructed Easement 2 also has been used by Perry. At trial, Coffey, a registered land surveyor and professional engineer who was hired to measure the width of

the gravel, testified that the width of the gravel on Easement 1 varies from approximately twenty-four feet where the easement meets Whirlwind Drive to approximately ten to twelve feet in other areas along Easement 1. The parties agree that there is at least one culvert located along Easement 1 and that this culvert limits the width of Easement 1 where the culvert lies. The evidence in the record on appeal shows that over the years when two vehicles traveling in opposite directions met on Easement 1 they would pull to the side to allow the vehicles to pass one another.

The evidence in the record on appeal does not preponderate against the Trial Court's finding that the width of Easement 1 is slightly greater than the width of the graveled section, but not as wide as Montgomery requests. Enlarging Easement 1 to the width requested by Montgomery would materially increase the burden on the servient estate, which in this case belongs to Niles. This would be contrary to Tennessee law. We also note that Easement 2, which can be accessed only over Easement 1, is specified in the Easement Agreement to be 15 feet wide. Both easements had the same grantor, Tony Hagwood. If Easement 1 is less than the 15 foot width of Easement 2, Easement 2 effectively would be limited not to the 15 feet specified in the Easement Agreement creating it but instead to the lesser width of Easement 1. The evidence in the record on appeal does not preponderate against the Trial Court's finding that the width of Easement 1 is fifteen feet "with wider turning aprons at the appropriate places . . . ."

We next consider whether the Trial Court erred in defining the term 'guests' as that term appears in the Easement Agreement. With regard to this issue, the Trial Court specifically found and held: "all easements described above shall be used only for single-family residential and non-commercial agricultural easements, but that said use will permit occasional utility vehicles and temporary construction vehicles."

In its memorandum opinion incorporated into the judgment by reference, the Trial Court specifically found and held, with regard to this issue:

> And let me, let me comment on that for just a minute because the word guests, in my opinion, is someone who's invited there, okay? That's how I'm construing the word guest. So he had people working there, they were there at his behest and I think that -- I don't think there's anything about that offends residential or agricultural use, so -- but, you know, let's take, for instance, the trust property, okay? I don't think that he can make a subdivision up there and put in forty houses and use the right-of-way that he's got. I think that is a, that would be a gross overuse of the right-of-way. And I don't -- I think there are other commonsensical limitations to it. If he has some business or something with John Deere in some commercial way that's behind them coming out to do a little bush hogging or test a bush

hog or something like that, I think that could become an overuse of the right-of-way, okay? But just, I mean, like that gas truck that was coming in to fill his tank up, I'm assuming, just a propane truck running in, filling up a tank, going back out, that's residential use. I mean, that's perfectly consistent with a residence being up there. So I don't, I don't want to limit the word guest to what, to those dictionary definitions. I think it's got a more common and ordinary definition that I, I would use in this matter, okay?

In his brief on appeal, Niles argues that the term 'guests' should be limited to people "being entertained or lodged at the residence." We find, as did the Trial Court, this proposed definition to be too restrictive given the evidence in the record now before us on appeal. Niles asserts in his brief on appeal that "Perrys [sic] presented no authority for a definition of 'guest' which would encompass the daily passage of commercial vehicles as were being conducted upon Perry's property for their large construction project." We agree with this assertion. We note, however, that the Trial Court did not hold that the term 'guest' included "the daily passage of commercial vehicles . . . [for a] large construction project." Instead, the Trial Court held that "*occasional* utility vehicles and *temporary* construction vehicles" were permitted (emphasis added). This definition comports with the evidence in the record showing the purpose intended by the parties to the Easement Agreement when they negotiated that agreement. We find no error in the Trial Court's definition of the term 'guests' as that term appears in the Easement Agreement.

Next, we consider whether the Trial Court erred in finding that Montgomery may use Easement 1 for agricultural purposes in addition to residential purposes. With regard to this issue, in his brief on appeal Niles cites only to the deed, which provides, in pertinent part, that the easement is "for residential purposes only . . . ." We agree that this is what the deed creating the easement provides and acknowledge that: "The use of an easement must be confined strictly to the purposes for which it was granted or reserved." *Shew*, 227 S.W.3d at 576 (quoting *Cellco P'ship d/b/a Verizon Wireless v. Shelby Cty.*, 172 S.W.3d 574, 596 (Tenn. Ct. App. 2005)).

It appears, however, that the use about which Niles actually is complaining concerns Montgomery's use of Easement 1 to remove hay from the Montgomery property. The proof in the record on appeal shows that Montgomery has over the years had someone cut hay on the Montgomery property and remove that hay. The use of Easement 1 for such a purpose does not offend the restriction provided in the deed that the easement be used "for residential purposes only . . . ." We caution, however, that if Montgomery is selling the hay or receiving any other compensation related to the growing, cutting, and removing the hay, that action would constitute a commercial

venture and would offend the deed restriction. We find that the action of clearing, mowing, or cutting vegetation from one's property, even hay, falls within the category of keeping the property maintained and can be considered a residential purpose absent, of course, an added commercial venture.

As a related issue, Niles raises the question of whether the Trial Court erred in finding that the 612 Trust could use their easement for residential and agricultural uses. The Trial Court found and held that the 612 Trust had a prescriptive easement to their property. Niles does not argue in his brief on appeal that the Trial Court erred in finding that a prescriptive easement in favor of the 612 Trust existed. Rather, Niles asserts that while there is proof that the 612 Trust property has been used for agricultural purposes, there is no proof that the property has been used for residential purposes and, therefore, to hold that it may be used for residential purposes would improperly enlarge the easement. Niles is mistaken.

In its brief on appeal, the 612 Trust points out that its Amended Complaint alleged that there is a residence on the property. It further asserts that Niles filed no "responsive pleading contesting those allegations."[3] Furthermore, Perry testified at trial that there are improvements on the 612 Trust property. We find no error in the Trial Court's holding that the 612 Trust has a prescriptive easement "for single-family residential and non-commercial agricultural . . ." use.

We next consider the issue of whether the Trial Court erred in failing to specify whether more than one single-family dwelling could be constructed on the 612 Trust property. We note that this issue was raised for the first time in the motion to alter or amend the judgment filed by Niles. By order entered August 30, 2017 the Trial Court denied the motion to alter or amend filed by Niles without specifically addressing this issue. Niles is asking this Court to make a finding on an issue not presented at trial and not determined by the Trial Court. We decline to do so. See *Crossley Const. Corp. v. Nat. Fire Ins. Co. of Hartford* wherein we stated:

> Except for some limited exceptions not applicable here, we will not consider issues, let alone claims, raised for the first time on appeal. *See City of Cookeville ex rel. Cookeville Reg'l Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 905–06 (Tenn. 2004) (noting the general rule that "questions not raised in the trial court will not be entertained on appeal." (quoting *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn.1983))).

---

[3] A careful and thorough review of the record on appeal reveals that the 612 Trust did plead this fact in its Amended Complaint. The record on appeal contains no responsive pleading to this complaint.

*Crossley Const. Corp. v. Nat. Fire Ins. Co. of Hartford*, 237 S.W.3d 652, 656 (Tenn. Ct. App. 2007).

Finally, we consider whether the Trial Court erred in finding that Niles was in contempt of court. With regard to civil contempt, our Supreme Court has instructed:

Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

The threshold issue in any contempt proceeding is whether the order alleged to have been violated is "lawful." A lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties. *Vanvabry v. Staton*, 88 Tenn. 334, 351–52, 12 S.W. 786, 791 (1890); *Churchwell v. Callens*, 36 Tenn. App. 119, 131, 252 S.W.2d 131, 136–37 (1952). An order is not rendered void or unlawful simply because it is erroneous or subject to reversal on appeal. *Vanvabry v. Staton*, 88 Tenn. at 351, 12 S.W. at 791; *Churchwell v. Callens*, 36 Tenn. App. at 131, 252 S.W.2d at 137. Erroneous orders must be followed until they are reversed. *Blair v. Nelson*, 67 Tenn. (8 Baxt.) 1, 5 (1874). However, an order entered without either subject matter jurisdiction or jurisdiction over the parties is void and cannot provide the basis for a finding of contempt. *Brown v. Brown*, 198 Tenn. 600, 610, 281 S.W.2d 492, 497 (1955); *Howell v. Thompson*, 130 Tenn. 311, 323–24, 170 S.W. 253, 256 (1914). Naturally, the determination of whether a particular order is lawful is a question of law.

The second issue involves the clarity of the order alleged to have been violated. A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. *Sanders v. Air Line Pilots Ass'n Int'l*, 473 F.2d 244, 247 (2d Cir. 1972); *Hall v. Nelson*, 282 Ga. 441, 651 S.E.2d 72, 75 (2007); *Marquis v. Marquis*, 175 Md. App. 734, 931 A.2d 1164, 1171 (2007); *Cunningham v. Eighth Judicial Dist. Ct. of Nev.*, 102 Nev. 551, 729 P.2d 1328, 1333–34 (1986); *Petrosinelli v. People for the Ethical Treatment of Animals, Inc.*, 273 Va. 700, 643 S.E.2d 151, 154–55 (2007). The order must, therefore, be clear, specific, and unambiguous.

*See Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d [465] at 471 [ (Tenn.2003) ]; *Long v. McAllister–Long*, 221 S.W.3d [1] at 14 [ (Tenn.App.2006) ].

Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of civil contempt. *City of Gary v. Major*, 822 N.E.2d 165, 170 (Ind. 2005); *Judge Rotenberg Educ. Ctr., Inc. v. Comm'r of Dep't of Mental Retardation*, 424 Mass. 430, 677 N.E.2d 127, 137 (1997); *Ex parte Slavin*, 412 S.W.2d [43] at 45 [ (Tex. 1967) ]. Orders need not be "full of superfluous terms and specifications adequate to counter any flight of fancy a contemner may imagine in order to declare it vague." *Ex parte Blasingame*, 748 S.W.2d 444, 446 (Tex. 1988) (quoting *Ex parte McManus*, 589 S.W.2d 790, 793 (Tex. Civ. App. Dallas 1979)). They must, however, leave no reasonable basis for doubt regarding their meaning. *Int'l Longshoremen's Ass'n, Local No. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967); *Salt Lake City v. Dorman–Ligh*, 912 P.2d 452, 455 (Utah Ct. App. 1996).

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. *United States v. Bernardine*, 237 F.3d 1279, 1282 (11th Cir. 2001); *United States v. Young*, 107 F.3d 903, 907–08 (D.C. Cir. 1997). Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge. *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006); *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 251 (2d Cir. 2002); *Town of Virgil v. Ford*, 184 A.D.2d 901, 585 N.Y.S.2d 559, 560 (1992); *Greene v. Finn*, 153 P.3d [945] at 951 [ (Wyo. 2007) ]. Determining whether an order is sufficiently free from ambiguity to be enforced in a contempt proceeding is a legal inquiry that is subject to de novo review. *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394 (9th Cir. 1991); *In re Leah S.*, 284 Conn. 685, 935 A.2d 1021, 1027 (2007); *City of Wisconsin Dells v. Dells Fireworks, Inc.*, 197 Wis.2d 1, 539 N.W.2d 916, 924 (1995).

The third issue focuses on whether the party facing the civil contempt charge actually violated the order. This issue is a factual one to be decided by the court without a jury. *See Pass v. State*, 181 Tenn. 613, 620, 184 S.W.2d 1, 4 (1944); *Sherrod v. Wix*, 849 S.W.2d 780, 786 (Tenn.

Ct. App. 1992). The quantum of proof needed to find that a person has actually violated a court order is a preponderance of the evidence. *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d at 474. Thus, decisions regarding whether a person actually violated a court order should be reviewed in accordance with the standards in Tenn. R. App. P. 13(d).

The fourth issue focuses on the willfulness of the person alleged to have violated the order. The word "willfully" has been characterized as a word of many meanings whose construction depends on the context in which it appears. *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *United States v. Phillips*, 19 F.3d 1565, 1576–77 (11th Cir. 1994). Most obviously, it differentiates between deliberate and unintended conduct. *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d [602] at 612 [ (Tenn. App. 2006) ]. However, in criminal law, "willfully" connotes a culpable state of mind. In the criminal context, a willful act is one undertaken for a bad purpose. *Bryan v. United States*, 524 U.S. 184, 191, 118 S. Ct. 1939, 141 L.Ed.2d 197 (1998); *State v. Braden*, 867 S.W.2d 750, 761 (Tenn. Crim. App. 1993) (upholding an instruction stating that "[a]n act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids").

In the context of a civil contempt proceeding under Tenn. Code Ann. § 29–9–102(3), acting willfully does not require the same standard of culpability that is required in the criminal context. *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d at 612. Rather, willful conduct

> consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is 'willful' if it is the product of free will rather than coercion. Thus, a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

*State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d at 612 (citations omitted). Thus, acting contrary to a known duty may constitute willfulness for the purpose of a civil contempt proceeding. *United States v. Ray*, 683 F.2d 1116, 1127 (7th Cir. 1982); *City of Dubuque v. Iowa Dist. Ct. for Dubuque County*, 725 N.W.2d 449, 452 (Iowa 2006); *Utah Farm Prod. Credit Ass'n v. Labrum*, 762 P.2d 1070, 1074 (Utah 1988). Determining whether the violation of a court order was willful is a

factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility. Thus, findings regarding "willfulness" should be reviewed in accordance with the Tenn. R. App. P. 13(d) standards.

*Konvalinka v. Chattanooga–Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 354–57 (Tenn. 2008) (footnotes omitted).

In his brief on appeal, Niles does not contest that the order alleged to have been violated was lawful. Nor does he contest the Trial Court's finding that he willfully engaged in the conduct, *i.e.*, placing T-posts, found to be a violation of the Trial Court's order. Niles does argue, however, that the order did not clearly and specifically prohibit him from taking the action of placing the T-posts along Easement 1.

The Trial Court's March 9, 2015 order which Niles was found to have violated states, in pertinent part:

> IT IS ORDERED, ADJUDGED AND DECREED, subject to the deposit of a cash bond by [Perry] with the Clerk & Master in the amount of $2,500.00, [Niles] shall immediately remove the truck obstructing the use by [Perry] of Easement No. 2 at its present location, and [Niles, his wife] and their agents be and are hereby enjoined and restrained from any obstruction of said easement by [Perry], his family members and guests, until the trial of this case can be heard, in order to preserve the status quo and until such time as the Court can determine from a trial on the merits the precise place where Easement 2 is to be physically located in the future.

The evidence in the record on appeal shows that Niles admitted at trial that after the Trial Court entered the injunction and told him not to block Easement 2, he put up T-posts in Easement 1 where Easement 2 is located, thereby obstructing Perry's ability to use Easement 2. Although the Trial Court's order did not specifically state that Niles could not place T-posts in Easement 1, it did specifically and clearly state that Niles was "enjoined and restrained from *any* obstruction of said [Easement 2] by [Perry], his family members and guests . . . ." (emphasis added). Niles admitted at trial that his action of placing the T-posts in Easement 1 after entry of the injunction obstructed Perry's use of Easement 2. We find the argument made by Niles that the Trial Court's order did not clearly and specifically prohibit him from placing T-posts in Easement 1 to be without merit. We find no error in the Trial Court's holding that Niles was in contempt of court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants, Winfield Scott Niles and Nancy Niles, and their surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE